UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Greenbelt Division

Committee for Ground Zero Museum
Workshop, and
Gary Suson                              DKC – 09 –CV- 3288
                    Plaintiffs,


        v.


        WILLIAM WILSON,

                    Defendant


PLAINTIFFS' SECOND AMENDED COMPLAINT

        Plaintiffs Committee for Ground Zero Museum Workshop (GZM) and Gary Marlon

Suson (Suson) (collectively Plaintiffs) for their Complaint against Defendant William Wilson

(Wilson or Defendant), states as follows:


**The Parties**

1.      Plaintiff Committee for Ground Zero Museum Workshop is an IRS 501(c)(3)

        organization created and existing under the laws of New York State and the United States

        of America. It is located at 420 West 4th Street,  Floor 2, New York, NY 10014.

2.      Plaintiff Gary Marlon Suson is an individual residing in and doing business in New York

        State. His  principal place of business is located at 420 West 14th Street, New York, NY

        10014.

3.      Defendant William Wilson is an individual residing in and doing business in Gaithersburg, Maryland. His residence and principal place of business is located at 721 Bright Meadow Dr., Gaithersburg, MD 20878.

**Jurisdiction and Venue**

4.      This Court has federal question jurisdiction over the action pursuant to 28 U.S.C. § 1331 as an action that arises under the laws of the United States.. This Court has subject matter jurisdiction over Plaintiff's claims for unauthorized access to website and related claims pursuant to 17 U.S.C. §1203.

5.      This Court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332. The controversy is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has supplemental jurisdiction over Plaintiffs' claims arising under the laws of Maryland pursuant to 28 U.S.C. § 1367(a) because these claims are so related to Plaintiffs' claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative fact.

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

8.      Personal jurisdiction over Defendant William Wilson is proper because a) his residence and principal location of business is located in this District and, (b) has committed tortious and other actionable acts alleged herein with foreseeable consequences in this District, and has caused actual tortious injury in this District.

**Facts**

9.      The Ground Zero Museum Workshop opened September 7, 2005. It showcases 100 images and artifacts from the "Recovery Period" at Ground Zero and is featured regularly in the top 10 list of many travel websites. Gary Marlon Suson is the executive director and founder of the Museum.

10.     Suson served as "Official Photographer at Ground Zero for the Uniformed Firefighters Association", a title confirmed by Fire Union Official Rudy Sanfilippo and former FDNY Chief of Department Dan Nigro.

11.     Suson is an Off-Broadway, feature film and TV actor registered with AEA, SAG and AFTRA theatrical unions. He is represented by an agency for voice-over work in NYC for TV and Radio as well as feature films.

12.     Due to his work at "Ground Zero" after September 11, 2001, Suson suffers from Post-Traumatic Stress Disorder for which he is undergoing treatment. Suson also was diagnosed with Chronic Obstructive Pulmonary Disease and is in a full time program to regain his health. His case is on file with the US Department of Justice and he is a recipient of a 9/11 Victim's Compensation Fund award.

13.     In July 2005, Mr. Nakka Murali of India created a website for GZM, under contract with GZM, with the internet address of www.groundzeromuseum.com. Mr. Murali has served as the webmaster of the GZM website since its inception. He performs all updates, changes, designs and maintenance of the website. Mr. Murali had, over the course of four years, inserted numerous "meta-tags" into the GZM website, which are key words that are recognized by search engines and can make a site rank higher.

14. GZM holds a common law the copyright on the full GZM website and controls the domain name "groundzeromuseumworkshop.com and also "www.groundzeromuseum.com."

15. GZM has held the common law copyright to the website and controlled the domain names since its inception.

16. On June 16, 2007, Defendant Wilson and partner Teresa Polino visited GZM.

17. Impressed with the work of Suson and GZM, Wilson offered to assist GZM by designing a shopping cart page for the GZM Shop page as well as revamping the look of his Gift Shop page. This shopping cart was an addition to the already existing Gift Shop page and the website as a whole. Wilson did not ask for any compensation nor any tax write-off from GZM. Wilson told Suson that his work was a gift to the Museum.

18. Suson accepted the offer of Wilson to design a shopping cart and revamp the look of the gift shop page as a part of the collective work of the GZM website.

19. During the summer of 2007, Suson provided to Wilson layouts, data, links and designs for the Gift shop page while Wilson encoded the shopping cart page.

20. Upon receiving the layouts and designs, at the direction of Suson, Wilson created the code for the shopping cart page. This code was to be inserted into the existing GZM website files so that the shopping cart would be integrated into the existing webpage.

21. The shopping cart code was inserted into the existing GZM website files on or about the fall of 2007. After the insertion of the code, the Cart Designs logo appeared on the bottom of the website pages as a sponsor of GZM.

22.    While designing the code, Wilson suggested a new hosting service for the GZM website, A-1 Hosting Services.

23.    Suson explained that he was content with Intercom.com in New York as Official Web Host/Sponsor, but Wilson explained that A-1 had a better high volume server and the website would run faster and smoother on A-1's servers. Suson explained that Intercom did not charge to host his website and Wilson said he would speak to A-1 about sponsorship.

24.    After speaking with Wilson, A-1 agreed to be a permanent sponsor, according to Wilson.

25.    A-1 Hosting Services agreed to donate hosting services to GZM as it was in the process of becoming a 501c3 organization with the IRS. Hosting services are where the host company stores the website files on its servers, rather than on the owner's business computer. A host does not own the website, but merely serves as a storage facility from which the site can be seen on the worldwide web. Suson agreed to switch hosts as a result of Wilson's persistence.

26.    In the spring of 2009, Wilson also offered to design a donations page for the GZM website. This page, as part of the overall GZM website, would allow people viewing the GZM website to make online, secure donations to the work of GZM.

27.    At the direction of Suson, Wilson designed the donations page, using Suson's 9/11 images and ideas gathered by Suson.

28.    The page code, written and designed by Wilson, was inserted into the GZM website files on or about Summer of 2009.

29.     On December 31, 2008, GZM was granted non-profit 501(c)(3) charitable organization status by the United States Internal Revenue Service. This status allowed all financial and in-kind donations to GZM to be tax-deductible. It was retroactive to 2007.

30.     Non-profit 501(c)(3) status is necessary when raising funds as people are more likely to donate to organizations where a tax deduction is given for donations.

31.     In the spring of 2009, after Suson mentions to Wilson that GZM is now has 501c3 status, Wilson asked Suson for a tax-writeoff for his work and Suson provided Wilson with a tax deduction receipt for $9,900.00 for the work performed in creating the shopping cart code writing, gift shop page and the donations page in 2008 and 2009.

32.     It was explained to Suson by Wilson that this was to be a one-time receipt for the work performed as part of the overall collaborative work of the GZM website. There was to be no more tax-write offs in the future.

33.     On or about August 9, 2009, derogatory comments about GZM and Suson were made on the tripadvisor.com "travel forum" by visitors to the website. This forum is for anyone and everyone to post their comments about any travel related subject and does not reflect the opinions of the owners or creators of the tripadvisor.com website.

34.     These comments refer to old, defamatory articles (and eventual lawsuit by Suson) written by the New York Post in 2005 attacking the Museum's credibility. Wilson, without authorization from GZM and without holding any official position with GZM, took it upon himself to defend GZM in the forum. In the course of this unauthorized action, Wilson revealed confidential information about GZM.

35.     GZM, upon being made aware of this unauthorized action and the revealing of

        confidential museum information, facts and figures, requested that Wilson not respond on

        behalf of GZM. It is the job of Suson, as the Executive Director of GZM to answer for

        and uphold the reputation of the Museum.

36.     Wilson ordered GZM founder and Executive Director Suson not to respond to the forum

        posts. Suson ignored Wilson's demand to "not respond" to the bloggers and left a reply

        message on the message board, much to Wilson's dismay. Wilson then sends an email to

        Suson, ridiculing him for answering the bloggers. Suson, angered by Wilson's comments,

        replies to Wilson via email with "f__k you" – angering Wilson further.

37.     On or about August 10, 2009, after being informed by Suson that his actions on the

        tripadvisor.com website were not authorized, Wilson sent a formal email to Suson

        resigning from his duties and any association with GZM.

38.     In his resignation email, Wilson falsely claimed to be resigning as webmaster of the

        GZM website. At all times from its inception to present, the GZM webmaster has been

        Mr. Nakka Murali in India.

39.     In his resignation email, Wilson also states he is returning control of the domain name to

        GZM. At all times since its inception to the present, the GZM website has only had two

        domain names "groundzeromuseumworkshop.com" and www.groundzeromuseum.com.

40.     These domain names were registered with GoDaddy.com in the name of Mr. Suson and

        his Museum, who remained in the control of these domain names since their inception to

        the present.

41.     Wilson never had control of or ownership of the domain names for the GZM website.

42.    At the time of his resignation email, Wilson had no duties with GZM other than periodic text changes on the site at the request of Suson if Mr. Murali was unavailable.

43.    GZM's only response to Wilson's resignation email was to request that Wilson do no harm to the GZM website.

44.    On or about August 10, 2009, after receiving the request to not harm the GZM website, Wilson, without authorization, used the security code designed to protect the GZM website files to access those files on the A-1 Hosting servers and deleted them or "hid them" in their entirety from the A-1 servers.

45.    In particular, Wilson knew that there were a few main "default pages" to the 9/11 website – meaning those that appear regularly when surfers do a search for a 9-11 Museum – and he deleted or hid those files (default pages) so it would appear to anyone trying to access Suson's Museum website as though the website was no longer in existence.

46.    Wilson intentionally deleted or hid the files/folders for the "Locations and Hours page" and "Home Page" and "Opening Flash page" which normally allowed potential guests to buy tickets.

47.    Wilson hid the files/folders for the Museum's home page, Locations Page and hid the files/folders for the opening introduction page.

48.    Wilson was not authorized to delete or hide the GZM files/folders from the A-1 hosting servers.

49.    The security code that protected the GZM website files on the A-1Hosting servers was a two-stage technological measure in which in the ordinary course of use requires the input

of information (the correct code) in order to gain access. It consisted of a Log-In name and passcode.

50.    Wilson did not have the authority of the owner of the code, GZM, to access the website or make changes to or alter the files without prior permission. His inputting of the code without authority of the owner was a circumvention of the technological measures designed to protect access to the GZM files.

51.    This deletion/hiding of the GZM website files and folders from the A-1 Hosting servers caused the GZM website to disappear from the worldwide web. It could no longer be viewed by anyone accessing the internet and entering the domain name or those who clicked on GZMW search engine default pages – main portals to the GZMW website – wound up going to a "page not found" error page.

52.    This deletion of the entire GZM website caused a loss of ticket sales, gift shop sales, available information about the Museum and decreased rankings in search engines.

53.    Rankings in search engines are important to a website in order to be located on the world wide web. When a person accessing the worldwide web enters a search term into a search engine, the pages matching the search terms that appear are ranked according to popularity. Popularity is determined through complex algorithms that measure how often a site is accessed through the worldwide web. The disappearance of a site from the worldwide web affects its ability to be accessed. This lack of access affects the measurement of its popularity, which in turn affects its ranking. A lower ranking site appears lower on the list of search term matches making it less likely to be accessed by the person searching.

54.   Also, when the GZM website files were deleted, the links to numerous interviews and articles about GZM were lost. Some of these links cannot be restored and are lost forever.

55.   On August 10, 2009, Suson mades a speakerphone call to Wilson and demanded that Wilson restore the site. This call was both witnessed by Todd Lefkovic and was recorded halfway through by Suson, with Wilson's knowledge of the recording. In this recorded call, Wilson admits he was responsible for the website disappearing by telling A-1 servers to remove the GZMW website from their server. Wilson states on tape, "They (A-1) told me to get a hold of them in case something happens, and that – I called them, that's what happened, that's why your directory listing went down." "So, You told me fuck you, I said sure, okay…When Suson states, "So, you did this out of spite?" Wilson responds, "I didn't do it out of spite -- I did it because you told me so." When Suson statee, "I never sent you an email asking you to disconnect our Museum website from the server," Wilson responded with, "What does f__k you mean? What does f__k you mean?"

56.   On or about August 11, 2009, Wilson emailed A-1 Hosting services. Again, he falsely claimed he was the webmaster for GZM. In the August 11, 2009 email, Wilson admits to destroying the GZM website.

57.   In the August 11, 2009 email to A-1 Hosting services, Wilson questioned the non-profit status of GZM.

58.   On or about August 20th, 2009, A-1 Hosting informed GZM it would no longer be willing to donate hosting services for the GZM website. GZM was given thirty (30) days to find a new host.

59.     After contact from local law enforcement in Montgomery County, Maryland, Wilson
        agreed to restore the GZM website and asked Suson for the new access codes to A-1's
        server so he can "fix" the website.

60.     GZM provided the new access codes to Wilson for the sole purpose of restoring the GZM
        website to the format it held on August 10, 2009.

61.     At the same time Wilson asked Suson for access to the Museum's private GOOGLE
        Adwords account, claiming he will "make the website rank higher in the search engines."

62.     Suson turned over the codes to Wilson, who at that point had access to the Museum's
        GOOGLE account and billing information. Most importantly, Wilson had access to
        GZM's "GOOGLE ANALYTICS" page, which is an itemized breakdown of which
        keywords, phrases and more help GZM to rank higher as well as which websites direct
        the most referring traffic over to GZM, such as Trip Advisor. With such information,
        Wilson knows the inner workings of GZM's website and how it correlates to search
        engines such as YAHOO! and GOOGLE.

63.     Wilson was not authorized to make any modifications or to delete any pages from the
        entirety of the website as it existed on August 10, 2009.

64.     Wilson only restored the website to the appearance it had at its inception in 2005. All
        updates and changes in the previous four years were not restored. This was a tactical
        move by Wilson to hurt GZM. It washed away four years of GZM website getting
        "friendly" with the search engines.

65.    Such an act by Wilson damaged the Museum's search engine rankings and in the process confused" the search engines, which were used to reading or "spidering" the 2009 version of the site.

66.    Wilson did not restore the work as part of the collaborative work of the GZM website the shopping cart or the Museum Gift Shop page.

67.    On or about August 18, 2009, Wilson again ended his work with GZM via email after an argument ensued between Suson and himself whereby Suson accused him of not doing what Det. Word told him to do. Suson accused him of dragging his feet after Wilson claimed that his time was devoted to paying clients. Suson asked Wilson to inform A-1 that any claims by Wilson to A-1 about GZM not being a legitimate charity were said so out of anger and were fact-less. Wilson refused and told Suson to fax the needed documents to A-1 and that would suffice, angering Suson.

68.    Upon receiving the August 18, 2009 email from Wilson, GZM changed the access codes with A-1 for the website files to protect itself from harm. GZM also changed the access codes to it's GOOGLE adwords account. The access code was virtually unbreakable, hand chosen by Suson and containing numerous symbols and numbers.

69.    On the same date, A-1 Hosting received a false claim from Wilson claiming ownership of the shopping cart, and gift shop page created as part of the collaborative work of the GZM website.

70.    Upon receipt of this false claim, A-1 Hosting "froze" the GZM website preventing it from being viewed or changed.

71.     On or about August 20, 2009, in an email to GZM, Wilson claimed ownership of the shopping cart and donation pages that were created as part of the collaborative work of the GZM website.

72.     Unknown to Suson at the time, Wilson removed all the relevant meta-tags from the GZM website so the search engines will not recognize the GZM website.

73.     A failure of the search engines to recognize the GZM website means it will be lower ranked by the search engines and harder to locate. This makes it harder for visitors to find out information about the Museum and/or order tickets and Gift Shop items.

74.     On or about August 21, 2009 A-1 Hosting claimed that malicious files had been uploaded to the A-1 servers using GZM codes. These malicious files would have allowed an attack on the A-1 servers.

75.     No one at GZM uploaded any malicious files or authorized the uploading of malicious files to the A-1 Hosting servers.

76.     To protect itself from any attack, A-1 Hosting changed the security access codes to the GZM website files. GZM was not provided the new code and was shut out of its own website files.

77.     Throughout the month of September, GZM worked with A-1 Hosting to regain access to its files and restore the website.

78.     September is the anniversary month of the September 11th attacks and as such is a very important month for the Ground Zero Museum Workshop.

79.     On or about September 11, 2009, Suson emailed A-1 Hosting requesting they contact Wilson to regain the codes to access the Museum Gift Shop page. This page is connected to the shopping cart, but exists independently and apart from the shopping cart.

80.     Wilson was holding the security access codes to the Museum Gift Shop page, a page on which he had done no work as part of the collaborative work of the GZM website.

81.     Without the security access codes to the Museum Gift Shop page, that page could not be transferred from A-1 to the new host server with the rest of the website files.

82.     Also on or about September 11, 2009, Suson emailed A-1 to inform the host that Wilson was not authorized to access the GZM website or any its files or pages.

83.     On or about September 12, 2009, Wilson again falsely asserted ownership of the shopping cart and Museum Gift Shop as part of the collaborative work of the GZM website via an email to GZM.

84.     In the September 12, 2009 email, Wilson admitted to removing the shopping cart and Museum Gift Shop page from the GZM website files. Wilson was not authorized to remove these pages from the GZM website files.

85.     Also on that date, Wilson against emailed A-1 Hosting falsely asserting ownership of the shopping cart and Museum Gift Shop website pages created as part of the collaborative work of the GZM website.

86.     In that same email to A-1 Hosting, Wilson falsely accuses Suson of using the September 11th attacks for personal profits.

87.     On or about September 13, 2009, Wilson an unknown person admitting he donated his services to GZM in creating the shopping cart and Museum Gift Shop page created as part of the collaborative work of the GZM website.

88.     He also falsely claims that Suson gambled with Museum donations.

89.     On or about September 13, 2009, without authorization to use the security access codes and secure login, Wilson again accessed the GZM website files. This time he destroyed the Museum Gift Shop page, replacing it with a page redirect command.

90.      A page redirect command is one that sends a viewer of a website to another page without the need to type in a website address to access the page being redirected to.

91.     In this case, the page redirect command sent those who were attempting to view the Museum Shop page to a New York Post story critical of GZM.

92.     Wilson was aware of the civil action between the New York Post and Suson for defamation as he acted as a proofreader, confidante and consultant for Suson since 2007 regarding this lawsuit.

93.     Wilson was not authorized by the website owner, GZM, to access the GZM website files or to redirect any page of the GZM website to the New York Post story.

94.     On or about September 14, 2009, Wilson against emailed A-1 hosting falsely asserting ownership of the shopping cart and the donation page created as part of the collaborative work of the GZM website.

95.     On or about September 14, 2009, Wilson filed a claim under the Digital Millennium Copyright Act ("DCMA") falsely asserting ownership of the shopping cart and donation page created as part of the collaborative work of the GZM website.

96.    This falsely filed DCMA claim caused the GZM website to be removed from access on the worldwide web by search engines.

97.    On or about September 14, 2009 Counsel for GZM and Suson sent via email to Wilson a Cease and Desist Letter. This Cease and Desist Letter demanded that Wilson stop falsely asserting ownership over the shopping cart and donation page and return the codes to access those pages to their rightful owner GZM.

98.    The Cease and Desist Letter also requested that Wilson cease making defamatory statements regarding both GZM and Suson.

99.    On or about November 20, 2009, Wilson created a website cam-scam.com for the purposes of harassing and defaming Suson and GZM.

100.   Wilson alleged this website is solely for educational purposes. However, it is a collection of false and malicious statements about Suson.

101.    The website also contained a collection of negative articles about Suson containing false data with regards to the NY Post defamation suit

102.   This site was not the fair and objective statement of facts it purports to be, but is a malicious attack on the reputation and integrity of Suson and an attempt to discredit Suson's non-profit Museum.

103.   As of the date of the filing of this complaint, Wilson has not complied with the requests made in the Cease and Desist letter.

104.   On or about December 3, 2009, Wilson created a false Myspace page to defame Suson and GZM. This page contains an unflattering image of Suson (taken by an unknown

source) when Suson was 50lbs overweight and chronically ill with his health after working at Ground Zero.

105.     Such image was juxtaposed next to a photograph of Suson when he was in excellent, pre-9/11 health and asks readers to look at the "real Gary Suson."

106.     This fake page on the social networking site contains false information about Suson.

107.     This fake page is purported to be about Gary Suson, but Mr. Suson was not involved in its creation in anyway. This fake page appeared on page 1 of Google searches for Gary Suson, causing Suson grave embarrassment.

108.     This fake page contains scurrilous information also found on the cam-scam.com page.

109.     Up until Wilson created this fake "Gary Suson My Space page", there had never been a Gary Suson My Space page in existence nor created by Suson.

**Count 1**
**Circumvention of Copyright Protection Systems**
**17 USCS §1201**

110.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 109  of the Complaint.

111.     At all times pertinent hereto, the GZM website files were protected by a security access code and a secure log in.

112.     At all times pertinent hereto, Wilson was only authorized to use the security access code and secure log in to access the GZM web page files to assist in the integration of the shopping cart and donation pages created as part of the collaborative work of the GZM website.

113.　At all times pertinent hereto, the security access code and secure log in were technological measures as defined in 17 USCS §1201, that effectively control access to the copyright protected work of the GZM website.

114.　At all times pertinent hereto, GZM was the proper copyright owner of the collaborative work of the GZM website in its entirety.

115.　On or about August 10, 2009, Wilson, without authorization by the copyright owner GZM, circumvented the technological measures of the security access code and secure log in to gain access to the files of the GZM website.

116.　After circumvention the technological measures, Wilson deleted or hid the GZM files/folders, thus removing the GZM website from the worldwide web entirely.

117.　On or about September 13, 2009, Wilson without authorization by the copyright owner GZM, circumvented the technological measures of the security access code and secure log in to gain access to the files of the GZM website.

118.　After the circumvention, Wilson deleted the Museum Shop page and inserted a webpage redirect command that redirected viewers to a defamatory New York Post story critical of GZM and Suson.

119.　Plaintiff GZM was damaged by Wilson's circumvention of the technological measures that controlled access to the copyrighted work of the GZM website in that the removal of the files after the circumvention caused the GZM to be removed from the worldwide web in the first instance. In the second instance, the Museum shop page only was removed. These removals from the worldwide web caused GZM to lose ticket sales, donations and Museum shop sales. It also contributed to the loss of the reputation of the Museum in that

valuable history links were lost, some forever. The redirect command to a page critical of GZM and Suson harmed GZM's reputation and standing.

Count Two
Computer Fraud and Abuse Act

120.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 109 of the Complaint.

121.    The Computer Fraud and Abuse Act ("CFAA"),18 U.S.C. § 1030 is a statute generally intended to deter computer hackers.

122.    "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action ... to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

123.    By gaining unauthorized access to the GZM webstie, Wilson, through an unauthorized password, violated § 1030(a)(5)(A)(iii), which prohibits any person from "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage," and, by such conduct, caused, in violation of § 1030(a)(5)(B)(i), "loss to 1 or more persons during any 1-year period ... aggregating t least $5,000 in value." Additionally the CFAA imposed this limit: "Damages for a violation involving only ... [§ 1030(a)(5)(B)(i)] are limited to economic damages. " 18 U.S.C. § 1030(g).

124.    The economic damages sustained by GZM and Mr. Suson include, at a minimum, the 60 days lost sales, between $42,000 t0 $60,000.

**Count Three**
**Trespass to Chattels**

125.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in

paragraphs 1 through  109  of the Complaint.

126.   At all times pertinent hereto, GZM was the owner of the GZM website and the owner of

the GZM domain name groundzeromuseumworkshop.com.

127.   On the following dates, Wilson wrongfully exercised or assumed authority over the GZM

website and/or its individual pages:

a. August 10, 2009, Wilson deleted or hid the GZM website in its entirety;

b. September 11, 2009, Wilson held the codes to shopping cart and Museum shop web pages

such that they could not be integrated as part of the GZM website in its entirety; and

c. September 13, 2009, Wilson asserted authority over the Museum shop page by inserting a

redirect command that directed viewers away from the GZM website to a New York Post

story critical of GZM and Suson.

128.   This wrongful exercise or assumption of authority over the GZM website deprived GZM

of possession of the GZM website for the period of time the website was unable to be

viewed on the world wide web.

129.    The wrongful exercise or assumption of authority over the shopping cart and Museum

shop web pages have permanently deprived GZM of the possession of those web pages.

130.   Plaintiff GZM was damaged by Wilson depriving GZM of possession of its website and

its individual web pages in that the removal of the files after the deprivation caused the

GZM website to be removed from the worldwide web. This removal from the worldwide

web caused GZM to lose ticket sales, donations and Museum shop sales. It also

contributed to the loss of the reputation of the Museum in that valuable history links were lost, some forever. The redirect command to a page critical of GZM and Suson harmed GZM's reputation and standing. The continued deprivation of the shopping cart and Museum shop web pages have deprived the Museum of ticket sales, donations and Museum shop sales.

Count Four
Defamation of Gary Marlon Suson

131.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through  109  of the Complaint.

132.   As the founder and Executive Director of GZM, Suson's reputation is integral to the successful operation of GZM.On or about September 12, 2009, the day after the 8th Anniversary of the September 11 Attacks, Wilson sent an email to A-1 Hosting, a third party, stating that Suson was using September 11th for his own profit. Of note is that Suson takes no salary as curator of GZM, choosing instead to donate his salary to charity. This email was intended to induce an evil opinion of Suson in the minds of people who hold to normal notions of morality.

133.   The evil opinion would be induced by the implication that Suson was personally profiting from a great national tragedy which would hinder him in his business of running the Ground Zero Museum Workshop and in raising funds to keep the museum in operation.

134.   Wilson, in sending the email A-1 Hosting, acted with malice in that he knew the statement was false but chose to send it anyway as a means of harming Suson.

135. Wilson desired to harm Suson with false, defamatory statements because Suson would not let Wilson act as the official spokesperson for GZM on travel forums/blogs.

136. Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart, and Museum Gift Shop pages, which were properly held and controlled by Suson as Executive Director of GZM.

137. On or about September 13, 2009, Wilson sent an email to an unknown number of third parties stating that Suson was using the donations made to GZM for gambling purposes.

138. This email was intended to induce an evil opinion of Suson in the minds of people who hold to normal notions of morality.

139. The evil opinion intended to be induced regarding Suson was one that charges Suson with criminal conduct in state or federal prison as using donations from a non-profit for gambling purposes is a crime. Wilson, in sending the email to an unknown number of third persons, acted with malice in that he knew the statement was false but chose to send it anyway as a means of harming Suson.

140. Wilson desired to harm Suson with false, defamatory statements because Suson would n

141. Wilson act as the official spokesperson for GZM. Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart and Museum Gift Shop pages which were properly held and controlled by Suson as Executive Director of GZM.

142. On or about November 20, 2009, Wilson created a website cam-scam.com.

143. The website is available to be viewed by an unknown number of persons on the worldwide web.

144. The website was intended to induce an evil opinion of Suson in the minds of people who hold to normal notions of morality. The evil opinion intended to be induced regarding Suson was that Suson was misappropriate 9-11 for personal profit and was a person of poor character.

145. Wilson acted with malice in creating the website in that he acted with deliberateness and calculation.

146. To create a website involves obtaining a domain name, locating a host, coding the pages and uploading the pages to the servers. It is not act of the heat of the moment.

147. Wilson desired to harm Suson with false, defamatory statements because Suson would not let Wilson act as the official spokesperson for GZM.

148. Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart and Museum Gift Shop pages which were properly held and controlled by Suson as Executive Director of GZM.

149. On or about December 3, 2009, Wilson created a false Myspace page regarding Suson.

150. This fake page is viewable to anyone accessing the Myspace social networking site.

151. This fake page was intended to induce an evil opinion of Suson in the minds of people ho hold to normal notions of morality.

152. The evil opinion intended to be induced regarding Suson was that Suson was misappropriate 9-11 for personal profit and was a person of poor character.

153. Wilson acted with malice in creating the website in that he acted with deliberateness and calculation.

154.   To create a website involves obtaining a domain name, locating a host, coding the pages and uploading the pages to the servers. It is not act of the heat of the moment.

155.   Wilson desired to harm Suson with false, defamatory statements because Suson would ot let Wilson act as the official spokesperson for GZM.

156.   Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart and Museum Gift Shop pages which were properly held and controlled by Suson as Executive Director of GZM.

157.    Suson was harmed by the defamatory statements made with malice by Wilson in that his reputation was harmed, this harm has interfered with his ability to fulfill his duties as Executive Director of GZM, as well as pursue his chosen profession of acting.

Count Five
Defamation of GZM

158.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 109 of the Complaint.

159.   As the founder and Executive Director of GZM, Suson's reputation is integral to the successful operation of GZM.

160.   On or about August 11, 2009, Wilson sent an email to A-1 Hosting stating that GZM did not possess 501(c)(3) status granted by the United States Internal Revenue Service.

161.   This email was intended to induce an evil opinion of GZM in the minds of people who hold to normal notions of morality.

162.   The evil opinion intended to be induced was that GZM was collecting donations of money and services through falsely pretending to be a non-profit organization.

163.    Wilson, in sending the email to A-1 Hosting, acted with malice in that he knew the statement was false.

164.    Wilson knew the statement was false because he had received a tax-deductible donation letter of services from GZM after GZM received its non-profit status from the IRS.

165.    Wilson desired to harm GZM with false, defamatory statements because Suson as Executive Director of GZM would not let Wilson act as the official spokesperson for GZM

166.    Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart, Museum Gift Shop web pages which were properly held and controlled by Suson as Executive Director of GZM.

167.    On or about September 12, 2009, the day after the 8th Anniversary of the September 11 Attacks, Wilson sent an email to A-1 Hosting, a third party, stating that Suson was using September 11th for his own profit.

168.    This email was intended to induce an evil opinion of Suson in the minds of people who old to normal notions of morality.

169.    The evil opinion would be induced by the implication that Suson was personally profiting from a great national tragedy which would hinder him in his business of running the Ground Zero MuseumWorkshop.

170.    Wilson, in sending the email A-1 Hosting, acted with malice in that he knew the statement was false but chose to send it anyway as a means of harming Suson.

171.    Wilson desired to harm Suson with false, defamatory statements because Suson would not let Wilson act as the official spokesperson for GZM.\

172.     Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart and donation websites which were properly held and controlled by Suson as Executive Director of GZM.

173.     On or about September 13, 2009, Wilson sent an email to an unknown number of third parties stating that Suson was using the donations made to GZM for gambling purposes.

174.     This email was intended to induce an evil opinion of Suson in the minds of people who hold to normal notions of morality.

175.     The evil opinion intended to be induced regarding Suson was one that charges Suson with criminal conduct in state or federal prison as using donations from a non-profit for gambling purposes is a crime.

176.     Wilson, in sending the email to an unknown number of third persons, acted with malice in that he knew the statement was false but chose to send it anyway as a means of harming Suson.

177.     Wilson desired to harm Suson with false, defamatory statements because Suson would not let Wilson act as the official spokesperson for GZM.

178.     Wilson further desired to harm Suson as a means of forcing Suson to relinquish the copyright to the shopping cart and donation websites which were properly held and controlled by Suson as Executive Director of GZM.

179.      GZM was harmed by Wilson's false and defamatory statements made with malice regarding Suson as Executive Director of GZM and regarding GZM itself. The reputation of GZM was harmed, in that the false and defamatory statements have led to a decrease in donations to GZM. GZM was further harmed by the false and defamatory statements

made with malice in that A-1 Hosting ceased donating website hosting services to GZM based on the e-mail sent by Wilson.

Count Six
Tortious Interference in a Business Relationship

180.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through  109  of the Complaint.

181.   Wilson was aware of the business relationship between GZM and A-1 Hosting in that he recommended and leveraged A-1 to host the GZM website.With knowledge that this was substantially certain to be the result of his actions, Wilson induced A-1 Hosting to no longer donate hosting services to GZM.

182.   Wilson induced A-1 Hosting to no longer donate hosting services to GZM by ordering them to no longer provide such services in his email of August 10, 2009.

183.   Wilson further induced A-1 Hosting to no longer donate website hosting services by falsely claiming that GZM was not a 501(c)(3) organization that would entitle it to donated services.

184.   In ordering A-1 to no longer donate hosting services and falsely claiming that GZM was not a 501(c)(3) organization, Wilson acted without reasonable justification, privilege or excuse.

185.    As a result of Wilson's actions, the business relationship between A-1 Hosting and GZM was severed.

186.  As a result of this severing, GZM was forced to locate another website hosting service at short notice.

187.  As a result of the severing, and Wilson's defaming of GZM, A-1 Hosting did not cooperate in a smooth transfer of the GZM website files from A-1 to the new website hosting service.

188.  GZM was damaged by Wilson's interference in its business relationship with A-1 in that the GZM website was not available on the worldwide web for viewing by the general public. This failure of availability of the website led to a loss of ticket sales, Museum shop sales and donations to GZM. This loss of availability led to decreased rankings in search engines.

Count Six
False Takedown under the Digital Millenium Takedown Act, 15 USC Sec 512

189.  Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through  109  of the Complaint.

190.  By falsely claiming his trademarks constituted copyrighted material, Defendant knowingly made material misrepresentations to effect a DCMA takedown, in violation of 26 USC 512 (f).

191.  Defendant is therefore liable to the Plaintiffs for the damages as described above, and attorneys fees.


WHEREFORE, Plaintiffs ask for the following relief

As to :

Count Ones and Seven, actual and/or statutory damages, attorneys fees, and the costs of this

action,

Count Two, economic damages

Counts Three through Six, compensatory and puntive damages, and the costs of this action,

Permanent Injunctive relief consistent with the relief requested above,

And for as all counts, any other relief this court deems just and proper.

JURY TRIAL DEMANDED ON ALL ISSUES SO DEMANDABLE

Respectfully submitted,

/s/*Thomas C. Willcox*
Thomas C. Willcox
5101 Wisconsin Avenue, N.W., Suite 210
Washington DC   20016
202 223-0090
Fax 202 452-0092
MD Federal Bar No:  16812
Email:  tomwillcox87@yahoo.com

*/s/ Elizabeth Pugliese*
Elizabeth Pugliese, Esq.
18173 Stage Leap Terrace
Germantown MD
elizabeth@ep-lawyer.com
MD Federal Bar No 18173