IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

GROUND ZERO MUSEUM WORKSHOP,
et al.                                    :

        v.                                :        Civil Action No. DKC 09-3288

                                          :

WILLIAM WILSON

                                          :

**MEMORANDUM OPINION**

Presently pending are five motions:   the motion to dismiss or for summary judgment filed by Defendant William Wilson (ECF No. 46); the motion for leave to file an amended counterclaim filed by Defendant William Wilson (ECF No. 47); and three motions to strike filed by Plaintiffs: to strike Defendant's motion to dismiss or for summary judgment (ECF No. 51), to strike Defendant's response to Plaintiffs' motion to strike the motion for summary judgment (ECF No. 56), and to strike Defendant's reply to Plaintiffs' opposition to the motion for summary judgment (ECF No. 57).  The issues are fully briefed and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Defendant's motion for summary judgment will be granted in part and denied in part, Defendant's motion for leave to file an amended counterclaim will be granted, and Plaintiffs' motions to strike will be denied.

I.   **Background**

   A.   **Factual Background**

Plaintiff Ground Zero Museum Workshop ("GZM") opened as a museum in 2005 and exhibits photographs and artifacts from the aftermath of the attack on the World Trade Center buildings on September 11, 2001. (ECF No. 39 ¶ 9). Plaintiff Gary Marlon Suson is an off-Broadway actor and photographer who personally took many of the photographs on display at GZM. (*Id.* at ¶¶ 10-11). Suson resides in New York City and is the executive director and founder of GZM. (*Id.* at ¶¶ 2, 9).

After a visit to GZM with his partner in 2007, Defendant William Wilson, a resident of Maryland, offered to donate his website expertise to GZM. (*Id.* at ¶¶ 16, 17; ECF No. 46-2, Wilson Aff., ¶ 6). Wilson is a sole proprietor who owns and operates a business under the trade name "Cart Designs" that provides internet shopping cart services. (ECF No. 46-2, Wilson Aff., ¶ 2). Wilson's shopping cart services are typically located on his own web server and are external to the seller's website. (*Id.* at ¶ 4).[1] At the time, GZM's website was hosted

_____

   [1] Wilson explains that a typical shopping cart service consists of three components: (1) a catalog page that displays items offered for sale and located on the same page as the seller's website, (2) a shopping cart service that holds the items selected for sale and that is located on an external server but configured to connect to the catalog page; and (3) a

on a web server maintained by a company called Intercom.com.
Wilson suggested that GZM switch to a new hosting service, A1-
Hosting Services ("A1-Hosting").   (*Id.* at ¶ 9-10).   Wilson had
prior experience with A1-Hosting and contacted it to see if it
would agree to donate its services to GZM, as GZM was then in
the process of obtaining 501(c)(3) status.   (*Id.* at ¶¶ 11, 22).
When A1-Hosting agreed, Wilson facilitated the transfer of the
GZM website from Intercom.com to A1-Hosting.   (*Id.* at ¶ 13).
Over time, Wilson made additional changes to the GZM website,
and in the spring of 2009 he offered to design a donations page
for GZM.  (ECF No. 39 ¶¶ 26-27; ECF No. 46-2 ¶ 16).[2]

The parties' relationship began to deteriorate in the
summer of 2009.   In early August, derogatory comments regarding
GZM and Suson were made on a travel forum page that was part of
the tripadvisor.com website.   (ECF No. 39 ¶ 33).   Wilson posted
a response to one of the critiques to defend GZM and Suson but
encouraged Suson to avoid commenting personally.   (ECF No. 46-2
¶ 20).   Suson did not agree with Wilson's approach, posted his
own response, and expressed his disapproval of Wilson's actions

---

checkout page that resides on a third server owned or controlled
by a payment processor.  (ECF No. 46-2, Wilson Aff., ¶ 4).

[2] The parties disagree as to the extent of Wilson's
contributions to the GZM website.   Plaintiffs contend that
Wilson contributed to "maybe 20% of the changes," while Wilson
contends his contributions were far more extensive.
(ECF No. 46-2 ¶ 16).

and advice in a heated email exchange. (*Id.*, Ex. 8). Wilson interpreted Suson's comments to mean that his services were no longer wanted and sent an email notification that he would "contact my people and have them pull the plug." (*Id.*). Wilson sent an email resignation on August 10, 2009, and used the user account and password that had been issued to him by A1-Hosting to access the GZM website to remove his shopping cart service and the "Cart Design" notifications from the various web pages within the GZM site. (ECF No. 46-2 ¶ 22). Wilson avers that he returned the GZM website to its configuration at the time in 2007 before he first introduced his shopping cart service. He also maintains that he contacted A1-Hosting to inform it of the situation.

Plaintiffs maintain that Wilson accessed the GWM website without authorization on August 10, 2009. They also contend that he deleted or hid certain files or default pages so it would appear to an outsider trying to access the GZM website that it was no longer in existence. (ECF No. 39 ¶¶ 44-46). Plaintiffs allege that Wilson's deletion of the website caused a loss of ticket sales and gift shop sales and decreased the website's ranking in search engines. (ECF No. 39 ¶ 52).

On August 11, 2009, Wilson sent an email to A1-Hosting stating "please be advised that I have resigned my position as webmaster for the Ground Zero Museum." (ECF No. 46-2, Ex. 11,

at GZM127).  The email further explained that Wilson had been operating under the assumption that GZM had very little income but that in an email and over the phone Suson had indicated that daily ticket sales met or exceeded $2,000.  Wilson also included a link directing A1-Hosting to an article from the New York Post asserting that Suson had donated only a few hundred dollars to charities.  (*Id.*).

That same day, A1-Hosting sent Suson an email confirming that the password for the GZM website account had been changed so that Wilson no longer had access.  (ECF No. 46-2, Ex. 12-1). A1-Hosting also requested information about GZM, its charitable mission, and copies of its tax returns.  (ECF No. 46-2, Ex. 10). Approximately ten days later, having received no documentation from Suson or GZM regarding its tax status, A1-Hosting informed GZM that it was no longer willing to donate its services and told GZM it had 30 days to find a new host.  (ECF No. 39 ¶ 58).

Meanwhile, Suson had contacted law enforcement officials in Montgomery County, Maryland, alleging that Wilson had committed a crime by hacking into the GZM website.  As a result, Detective Patrick Word with the Gaithersburg, Maryland police department contacted Wilson.  (ECF No. 46-2 ¶ 26).  Wilson contends that the Detective told him that if he did not agree to mediate the dispute a search warrant for all his computers would be issued. (*Id.*).  As a result of the mediation, Wilson agreed to restore

the GZM website to its prior configuration.  To accommodate Wilson's work, Suson provided him with a new password from A1-Hosting.  (ECF No. 46-2 ¶¶ 26; ECF No. 39 ¶¶ 59-60).  Wilson also asked for, and received, access to GZM's Google Adwords account and its Google Analytics page and used this access to add metadata to optimize the website for search engines.  (ECF No. 46-2 ¶ 27; ECF No. 39 ¶ 61).  It appeared the two parties had worked through their differences.

The temporary détente between the parties ended on August 18.  Suson sent a harshly worded email to Wilson regarding Wilson's comments to A1-Hosting wherein Wilson had expressed doubts about GZM's tax status.  (ECF No. 46-2, Ex. 15).  Wilson refused to vouch for GZM to A1-Hosting and told Suson to send A1-Hosting the documentation it had requested.  When Suson refused to apologize, Wilson resigned a second time.  (*Id.* at Exs. 16-17).  Thereafter, Suson contacted A1-Hosting, who again changed the password for the GZM web hosting account so that Wilson no longer had access.

On August 20, 2009, in an email to GZM, Wilson claimed ownership of the shopping cart and donations page that were created as part of his collaboration with the GZM website.  (ECF No. 39 ¶ 71).  The following day, Wilson informed A1-Hosting via email that he believed GZM and Suson were using his

intellectual property without authorization.  (ECF No. 46-2, Ex. 20).

On August 21, 2009, A1-Hosting sent an email to Suson informing him that A1-Hosting would no longer provide free hosting services and giving Suson notice to move the GZM website to a new web hosting service provider by September 2, 2009. (ECF No. 46-2, Ex. 21).  A1-Hosting provided a list of several alternate service providers and responded to questions from Suson regarding the GZM website's requirements.  A1-Hosting also extended its original deadline beyond September 2, 2009, because GZM was still working to transfer the site to the new host, LunarPages.com, on that date.

Also in its August 21, 2009 email, A1-Hosting notified Suson that "it appears someone has uploaded malicious files to our server using your FTP credentials.  The nature of the files lead us to believe that they are a type that would be used to compromise a server to gain illegal access to it."  (ECF No. 52-7, at 17, GZM 468).  Plaintiffs contend that its webmaster, Nakka Murali[3] and Benjamin Briggs, an employee of Global Market Exposure and a "specialist in the search engine optimization process", have expressed opinions that Wilson was responsible

_____

[3] Plaintiffs alternate between referring to their webmaster as Nikka Murali and Nakka Murali.  Because his affidavit identifies him as Nakka, this memorandum opinion adopts that spelling.

for uploading the malicious files.  (ECF No. 52, at 13).  The affidavits submitted by Messrs. Murali and Briggs do not express this opinion, however.  (*See* ECF Nos. 52-10 and 52-11).  In addition, the affidavit of Don Lockaby, the owner of A1-Hosting, stated that the malicious files could not have been uploaded by Wilson because Suson "created a very powerful password and it is impossible that [Wilson] or anyone else could have guessed it" and the files were not present on A1-Hosting's server until August 19, 2009, after the password had been changed at Suson's instruction and Wilson no longer had access.  (ECF No. 46-6, Lockaby Aff., ¶ 18.)[4]

On September 13, 2009, Suson sent an email to A1-Hosting alleging that "some individual has hacked into our 9/11 website again   .   .   .   and   destroyed   this   page: http://www.groundzeromuseumworkshop.com/catalog.asp."  (ECF No. 46-2, Ex. 27).  A1-Hosting explained that there had been no hack, instead the shopping cart support had been terminated by Wilson and, thus, the GZM website could not get any data from

---

[4]   In their motion to strike Defendant's motion for summary judgment, Plaintiffs challenge the admissibility of Mr. Lockaby's affidavit, arguing that it should be considered expert testimony and inadmissible because Wilson did not disclose Lockaby as an expert pursuant to Fed.R.Civ.P. 26(a)(2). (ECF No. 51, at 11-13).  Mr. Lockaby is the owner of A1-Hosting and may be able to testify in that capacity regarding A1-Hosting's operation and assessments made by A1-Hosting about GZM's website without being qualified as an expert.

Wilson's database.  (*Id.*).  The following day, upon checking the GZM website's Domain Name Server record and ascertaining that it had been moved to a new server, A1-Hosting stopped servicing the website.

On September 14, 2009, Wilson sent a notice to A1-Hosting that he categorized as a "Notice of DMCA Filing"[5] informing A1-Hosting that GZM continued to use his Cart Design logo without authorization.  (ECF No. 46-2, Ex. 28).  Wilson got a response stating that A1-Hosting was no longer hosting the GZM website and took this to mean his notice had worked.  (ECF No. 46-2, Ex. 29).  He later learned that the GZM website had simply been transferred to LunarPages.com before A1-Hosting received his letter.  Wilson did not send a similar notice to LunarPages.com, but he did offer GZM, through GZM's counsel Elizabeth Pugliese, the use of his catalog page along with the catalog database if GZM removed all references to Cart Designs.  (ECF No. 46-2, Ex. 30).  Because GZM never removed the logos or the catalog page, Wilson's shopping cart service continued to receive call-ups from the GZM website.  At some point after September 19, 2009, Wilson changed his shopping cart page to display New York Post articles about GZM and Suson whenever it received a call-up from the GZM website.  (ECF No. 46-2 ¶¶ 42-43).  Wilson also created

---

[5] "DMCA" refers to the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201, *et seq.*

a separate website published under the name "cam-scam.com" where he offered his insights about Suson's case against the New York Post and linked to the articles published by the Post that were the subject of Suson's lawsuit. (ECF No. 46-2 ¶ 44). The first page of the website included a disclaimer of sorts stating:

> There have been a number of articles and documents published about the GroundZero Museum workshop and its founder, Gary Suson, a.k.a. Gary Marlon Suson, -or- Marlon Suson, as well as their history. This site was created to offer the reader a source for this public domain material strictly for educational purposes. Neither this website, nor its creator makes any claim or judgement [sic] as to guilt or innocence, or right or wrong.
> Who or whom is right or wrong, or guilty or innocent?
> Well, that's up to you, the reader, to decide.

(*Id.*). Wilson also included a link from the cam-scam.com website to Suson's MySpace webpage and he posted a screen shot of Suson from the MySpace page on the cam-scam.com website next to a photograph that Wilson had taken of Suson while they were working together. (ECF No. 46-2 ¶ 45). Suson avers that he never created a MySpace page and he considers the photo that Wilson took of him to be unflattering. (ECF No. 52-1 ¶ 10).

**B.   Procedural Background**

Plaintiffs initiated this lawsuit on December 10, 2009, asserting claims for copyright violations, conversion, defamation, tortious interference in a business relationship,

and intentional infliction of emotional distress.  (ECF No. 1).
Defendant filed his answer and asserted counterclaims for fraud,
breach of implied contract, quantum meruit, unjust enrichment,
breach of contract, trademark infringement, and misuse of trade
secret.  (ECF No. 8).  Plaintiffs moved to dismiss Defendant's
counterclaims, but the motion was denied.  (ECF Nos. 10, 23).
Plaintiffs have subsequently amended their complaint twice.
(ECF Nos. 27, 39).  The operative second amended complaint
includes seven counts.  Count I alleges that Defendant
circumvented a copyright protection system in violation of the
DMCA, 17 U.S.C. § 1201.  Count II alleges that Defendant
violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §
1030.  Count III alleges that Defendant is liable for trespass
to chattels.  Counts IV and V allege that Defendant is liable
for defaming Suson (count IV) and GZM (count V).  Count VI
alleges that Defendant is liable for tortious interference in a
business relationship.  Finally, count VII alleges that Wilson
acted in violation of 17 U.S.C. § 512(f) by knowingly making
material misrepresentations to effect a takedown under the DMCA.

Following discovery, on February 22, 2011, Defendant moved
to dismiss or for summary judgment.  (ECF No. 46).  Plaintiffs
opposed the motion and simultaneously moved to strike it by
arguing that Defendant fails properly to cite to the record to
support the facts upon which he relies.  (ECF Nos. 51-52).

Plaintiffs subsequently moved to strike both Defendant's opposition to the motion to strike and his reply regarding his summary judgment motion as untimely. (ECF Nos. 56 and 57). Defendant has also moved for leave to amend his counterclaims. (ECF No. 47).

## II. Motions to Strike

Before turning to the merits of Defendant's dispositive motion for summary judgment or dismissal, Plaintiffs' motions to strike will be resolved in order to determine the body of information that may be considered on summary judgment.

Plaintiffs contend that Defendant's opposition to their motion to strike the summary judgment motion should itself be stricken because it was filed one day late and Defendant had not sought an extension. (ECF No. 56, at 3). Plaintiffs' motion to strike the summary judgment motion was filed and served via electronic filing on March 28, 2011. Plaintiffs contend that pursuant to Local Rule 105.2, all memoranda in opposition to a motion shall be filed within 14 days of service, and thus Defendant's opposition, filed on April 12, 2011, was a day late. (ECF No. 56, at 3). Pursuant to Fed.R.Civ.P. 6(d), however, when service is completed via electronic means, pursuant to Fed.R.Civ.P. 5(b)(2)(E), three days are added to the response time. Accordingly, Defendant's opposition was not due until April 14, 2011, and was timely filed. Plaintiffs' motion to

12

strike the opposition to their motion to strike the summary judgment motion will be denied.

Plaintiffs also move to strike Defendant's reply in response to Plaintiffs' opposition to summary judgment as untimely. (ECF No. 57). Plaintiffs contend that pursuant to the Local Rules, Defendant's reply was due on April 11, 2011. Defendant's reply was not filed until April 26, 2011, and he did not seek an extension. (*Id.* at 3). In response, Defendant's counsel argues that he believed the reply had been properly filed on time via CM/ECF and that once he realized his mistake he promptly filed the reply and submitted a copy to Plaintiffs. (ECF No. 59, at 3). Defendant also notes that Plaintiffs have not articulated any prejudice from the delay. (*Id.*).

Although court deadlines are not to be taken lightly or recklessly disregarded, the court has discretion to excuse minor delays, particularly where no party has been prejudiced. Accordingly, Plaintiffs' motion to strike Defendant's reply in response to Plaintiffs' opposition to summary judgment will be denied.

Plaintiffs' final motion to strike, the motion to strike Defendant's motion for summary judgment, has a more substantive basis. Plaintiffs argue that the motion should be stricken because it fails to cite to the record, in violation of Fed.R.Civ.P. 56(c)(1), and it contains testimony from

undisclosed experts.  (ECF No. 51, at 5).  Plaintiffs proceed to include a list of thirteen allegedly unsupported facts in Defendant's memorandum.  (*Id.* at 5-11).  Plaintiffs also object to the inclusion as exhibits of the affidavits of Defendant and Donald Lockaby as containing expert opinion that was not properly disclosed pursuant to Fed.R.Civ.P. 26(a)(2)(A).  (*Id.* at 12-13).

Plaintiffs' motion to strike is overly broad and will be denied.  To the extent Plaintiffs challenge specific factual assertions within Defendant's motion and supporting documentation or the admissibility of certain pieces of evidence, these challenges will be considered when ruling on the motion's substantive merits.  Striking the motion wholesale would be neither efficient nor effective at streamlining the disputed issues.

## III. Motion for Summary Judgment

Defendant moves to dismiss or in the alternative for summary judgment.  Throughout the motion and memorandum in support, Defendant interweaves factual allegations from the complaint with record evidence obtained during the discovery. Plaintiffs respond with evidentiary material.  Accordingly, the motion will be considered as one for summary judgment where the court may consider materials outside of the pleadings.

A.    Standard of Review

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or

other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

**B.  Analysis**

**1.  Circumvention of Copyright Protection Systems, DMCA, 17 U.S.C. § 1201**

Congress enacted the DMCA in 1998 "to strengthen copyright protection in the digital age." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2[d] Cir. 2001). A portion of DMCA, 17 U.S.C. § 1201(a)(1)(A), provides: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." Subsection three further explains:

(3) As used in this subsection--

(A) to "circumvent a technological measure"
means to descramble a scrambled work, to
decrypt an encrypted work, or otherwise to
avoid, bypass, remove, deactivate, or impair
a technological measure, without the
authority of the copyright owner; and

(B) a technological measure "effectively
controls access to a work" if the measure,
in the ordinary course of its operation,
requires the application of information, or
a process or a treatment, with the authority
of the copyright owner, to gain access to
the work.

17 U.S.C. § 1201(a)(3).   As the Federal Circuit noted in
*Chamberlain Grp. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193
(Fed.Cir. 2004), *cert. denied*, 544 U.S. 923 (2005), "[t]he plain
language of the statute therefore requires a plaintiff alleging
circumvention (or trafficking) to prove that the defendant's
access was unauthorized."[6]

---

[6] There is disagreement as to whether liability under
§ 1201(a) can only exist if the circumvention device facilitated
infringement.  Neither the Fourth Circuit nor any district court
within this circuit has addressed the issue.  The Federal
Circuit has limited liability under § 1201(a) to devices that
facilitate infringement.  *Chamberlain Grp.*, 381 F.3d at 1193.
In contrast, the Ninth Circuit has interpreted the statute to
create "a distinct anti-circumvention right under § 1201(a)
without an infringement nexus requirement."  *MDY Indus., LLC v.
Blizzard Entm't, Inc.*, 629 F.3d 928, 952 (9th Cir. 2010).  The
issue need not be decided here because Plaintiffs have not
established that circumvention of technological measures took
place.

In the second amended complaint, Plaintiffs allege that Wilson circumvented copyright protections on the GZM website on two occasions: (1) on August 10, 2009, when Wilson used the security access code to log in to the GZM website and deleted or hid GZM files or folders, and (2) on September 13, 2009, when Wilson allegedly circumvented the technological measures to gain access to the website and "deleted the Museum Shop page and inserted a webpage redirect command that redirected viewers to a defamatory New York Post story critical of GZM and Suson." (ECF No. 39 ¶¶ 115-18).[7]   Wilson argues that Plaintiffs have not stated a claim for circumvention of copyright protection because their complaint alleges that they authorized Wilson's access to the GZM website by providing him with the necessary security codes. (ECF No. 46-1, at 9-10 (citing Compl. ¶¶ 42, 44, 50, 60, 79, 80, 112)).   Indeed in paragraph 112, the complaint alleges that Defendant was "authorized to use the security access codes and secure log in to access the GZM web page files." (ECF No. 39 ¶ 112).   Wilson further argues that to the extent Plaintiffs are alleging that he made unauthorized changes to the website after using the security codes, such claims are not

---

[7] In their opposition to the motion for summary judgment, Plaintiffs argue that Wilson's uploading of a malicious file on or about August 18, 2009, is also a violation of § 1201. (ECF No. 52 at 17).   Plaintiffs have produced no evidence to link Wilson to the uploading of malicious files on that date.

actionable under the DMCA. (ECF No. 46-1, at 11). Wilson also argues that because he is either a co-owner of the protected copyright in the website or has exclusive rights to the copyright of the elements he contributed individually to the website, he had a legal right to access the website and cannot be liable under § 1201. (*Id.* at 13-17).

Plaintiffs argue in response that Wilson's authorization to access the website using the security code was revoked when he resigned on August 9, 2009, and that any times he used the codes after that date were violations of § 1201. Plaintiffs further contend that whatever interest Wilson had in the website's content did not confer upon him any right to make unauthorized changes. (ECF No. 52, at 17).

Other courts in this district have not had occasion to interpret the scope of conduct prohibited by § 1201(a)(1). But several district courts in other circuits have explained persuasively that using a password or security code to access a copyrighted work, even without authorization, does not constitute "circumvention" under the DMCA. *See, e.g., Egilman v. Keller & Heckman, LLP*, 401 F.Supp.2d 105, 112 (D.D.C. 2005); *I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, 307 F.Supp.2d 521, 532-533 (S.D.N.Y. 2004); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F.Supp.2d 878, 889 (N.D.Ohio 2009). In *I.M.S. Inquiry Management Systems*, the defendant had used a

password intentionally issued by plaintiff to a third party in order to access plaintiff's protected website without authorization. 307 F.Supp.2d at 522. The court explained "[c]ircumvention requires either descrambling, decrypting, avoiding, bypassing, removing, deactivating or impairing a technological measure *qua* technological measure" and determined that because the defendant had not surmounted or punctured or evaded any technological measure to access the website, he had not violated the statute. *Id.* at 532. In other words, mere use of a technological measure was not prohibited by the DMCA. *Id.* at 533. This logic was adopted by the United States District Court for the District of Columbia in *Egilman*, and that court concluded "using a username/password combination as intended--by entering a valid username and password, albeit without authorization--does not constitute circumvention under the DMCA." 401 F.Supp.2d at 112. This interpretation is persuasive and defeats Plaintiffs' claim because Plaintiffs have not alleged any facts to suggest that Wilson ever accessed the GZM website without using a security pass code issued by Plaintiffs or A1-Hosting.

Even if mere unauthorized use of a password is sufficient to establish liability under § 1201(a), Plaintiffs have not established that Wilson accessed their website on the alleged days without authorization. Plaintiffs' argument is that

because Wilson resigned as webmaster on August 10, 2009, "he revoked his own authorization when he stated he was returning the domain to GZM upon his resignation." (ECF No. 52, at 16). Wilson does not agree with this characterization of the effect of his resignation, and Plaintiffs have produced no evidence of any communications from Wilson to Plaintiffs demonstrating such an intent.  The only conclusion that can be drawn from the facts in the record is that Wilson's access to the website was authorized until GZM requested that A1-Hosting change the security pass codes on August 11, 2009.  Accordingly, there was no circumvention when Wilson accessed the website on August 10, 2009.

With respect to the second alleged date of unauthorized access, September 13, 2009, Plaintiffs have identified no evidence to prove that Wilson even accessed the GZM website on that day.  Instead the evidence shows that Wilson made changes to the shopping cart page, a page hosted on his own server but linked to the GZM website.  Wilson and A1-Hosting repeatedly tried to explain this distinction to Plaintiffs to no avail. Nevertheless, Plaintiffs' confusion cannot sustain a claim for violation for 17 U.S.C. § 1201.

**2.   Computer Fraud and Abuse Act, CFAA, 18 U.S.C.
§ 1030(a)(5)(A)(iii)**

Plaintiffs cite to a prior section of the statute that no
longer exists.   A similar provision, now found at 18 U.S.C.
§ 1030(a)(5)(C), creates criminal and civil penalties for anyone
who "intentionally accesses a protected computer without
authorization, and as a result of such conduct, causes damage."
Subsection 1030(g) authorizes civil actions to enforce the CFAA,
but such an action may only be brought if the violation "caused
one of the factors set forth in subclauses (I), (II), (III),
(IV), or (V) of subsection (c)(4)(A)(i)."   The relevant
subclause here is (I): "loss to 1 or more persons during any 1-
year period (and, for purposes of an investigation, prosecution,
or other proceeding brought by the United States only, loss
resulting from a related course of conduct affecting 1 or more
other protected computers) aggregating at least $5,000 in
value."   § 1030(c)(4)(A)(i)(I).   The CFAA under § 1030(e)(11)
defines "loss" as:

>    any reasonable cost to any victim, including
>
>    (i) The cost of responding to an offense,
>
>    (ii) Conducting a damage assessment,
>
>    (iii) Restoring the data, program, system,
>    or information to its condition prior to the
>    offense, and

> > (iv) Any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service[.]

Section 1030(g) further provides that damages for a violation of conduct described in subclause § 1030(c)(4)(A)(i)(I) are limited to economic damages.

In his initial memorandum in support of the motion to dismiss or for summary judgment, Wilson argued that the Plaintiffs fail to state a claim because count II is merely a recitation of the statutory language with no supporting facts. (ECF No. 46-1, at 20). Specifically, Wilson argued that the claim fails because it does not plead the defendant's state of mind at the time when the alleged unauthorized access occurred and the statute requires that an individual's actions be intentional. (*Id.*). Wilson also argued that the bare allegation of use of an "unauthorized password" is inadequate, that Plaintiffs did not suffer a loss of value of $5,000 due to his conduct, and that Plaintiffs failed to allege that the GZM website was a protected computer. (*Id.* at 21-22). In response, Plaintiffs contend that the facts show that Wilson's authorization to access the website had been revoked, that Suson's affirmation makes clear that Plaintiffs incurred over $5,000 in one year as a result of Wilson's stripping of the metatags, and that "the proprietor of a computer is perhaps the best judge of whether it is protected or not." (ECF No. 52, at

18).  In his reply, Wilson primarily argues that Plaintiffs have produced no evidence to establish the requisite elements of the claim.

At this stage, when challenged by a motion for summary judgment, Plaintiffs must do more than state a claim for violation of the CFAA.  Instead, they must set forth specific facts showing that there is a genuine issue for trial.  Putting aside the question of whether Wilson accessed the website without authorization, which was discussed in connection with count I, Plaintiffs have produced no evidence to back up their assertion that Wilson damaged the website or that his actions caused at least $5,000 in economic damages in one year.  A CFAA plaintiff must "show that there are triable issues as to (i) whether a CFAA-qualifying 'loss' aggregating at least $5,000 occurred, and (ii) whether this loss was 'caused' by a CFAA violation."  *Global Policy Partners, LLC v. Yessin*, 686 F.Supp.2d 642, 646 (E.D.Va. 2010).  Plaintiffs have done neither.

The complaint does not even identify the damage that allegedly was caused by Wilson's unauthorized access, but Plaintiffs' subsequent submissions indicate that the alleged damage was Wilson's "stripping of the metatags from the website." (ECF No. 52, at 18).  Plaintiffs point to no evidence from which a reasonable jury could conclude that Wilson stripped

metatags from the website for a period of time long enough to cause the minimum amount of damage required to maintain a civil action.  On August 10, 2009, Wilson used the security password issued to him to access the GZM website and replaced the website with its 2007 version.  By the following day, at the urging of a Gaithersburg police officer, Wilson restored the site to its prior condition.  (ECF No. 46-1 ¶ 26).  Wilson further claims that at that point he actually added metadata tags to optimize the website for search engines.  (ECF No. 46-2 ¶ 27, Ex. 14).  Plaintiffs never directly dispute this, and they never provide evidence showing when or how Wilson removed metatags, which metatags he removed, how this may have affected site traffic, and how it can be quantified in economic losses.  The only semblance of proof offered by Plaintiffs is the affidavit of Benjamin Briggs, an employee of Global Market Exposure.  In that affidavit, Briggs states that Suson told him the website was inaccessible from August 10, 2009 until mid-October 2009 and that such a long period of downtime would cause search engines to assign a penalty to the website when it comes back online.  (ECF No. 52-11, at 2).  Notwithstanding the fact that Plaintiffs have failed to establish that Briggs is knowledgeable with respect to search engine optimization, his opinion is based on statements made by Suson that are not supported by the record

evidence.    Moreover,  Brigg's  affidavit  does  not  quantify  the
harm allegedly caused to the GZM website.

Additionally, Suson's statement in his affirmation does not
establish that Plaintiffs suffered qualifying losses of at least
$5,000 in a year.  Suson affirms that GZM paid Global Management
Exposure  $8,079  through  the  end  of  2010  "to  increase  the
visibility  of  the  GZM  website  back  to  where  it  was  before
Defendant  stripped  the  metatags."    (ECF  No.  52-1,  at  2).
Plaintiffs  provide  no  additional  proof  of  this  payment,  no
itemization  of  the  costs,  nor  any  other  facts  from  which  one
could  determine  that  these  were  "reasonable  costs"  as  required
under the CFAA.  In addition, because Suson affirms that he paid
$8,079  over  a  time  period  greater  than  one  year,  it  would  be
mere speculation or guesswork to conclude that in a shorter time
period he paid at least $5,000.

In short, Plaintiffs cannot establish that Wilson accessed
a protected computer without authorization, that Wilson's access
resulted in cognizable loss to the website or GZM, or that GZM
suffered losses greater than $5,000 in one year.  For all these
reasons, judgment in favor of Defendant Wilson will be granted
on count II.

### 3.    Trespass to Chattels

Count  III  of  the  second  amended  complaint  alleges  that
Wilson  is  liable  for  the  tort  of  trespass  to  chattels  for  his

wrongful exercise or assumption of authority over the GZM website and/or its individual pages. Wilson argues that this count is preempted by the United States Copyright Act, 17 U.S.C. § 301(a), or alternatively that his "independent rights in and to the GZM website . . . give him an equal right of possession to the extent either party can 'possess' an intangible right." (ECF No. 46, at 23-25). Plaintiffs do not agree that the claim is preempted by the Copyright Act and contend that any colorable claim of copyright ownership that Wilson may have in the website's content does not grant him authorization to commit a tort, but should be addressed in an action for an accounting. (ECF No. 52, at 22).

17 U.S.C. § 301(a) provides:

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

Courts have interpreted the preemption inquiry as consisting of two parts. First, the work must be "within the scope of the 'subject-matter of copyright' as specified in 17 U.S.C. §§ 102,

103," and second, "the rights granted under state law" must be "equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Rosciszewski v. Arete Assocs.*, 1 F.3d 225, 229 (4th Cir. 1993) (quotation marks and citation omitted); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997) (reciting same two prongs in opposite order). If the state law claim requires an extra element "instead of or in addition to the acts of reproduction, performance, distribution or display . . . then the right does not lie within the general scope of copyright," provided that the extra element alters the nature of the claim such that it is qualitatively different from a copyright claim. *U.S. ex rel. Berge v. Bd. of Trs.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (citing *Rosciszewski*, 1 F.3d at 229-30; *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659-60 (4th Cir.), *cert. denied*, 510 U.S. 965 (1993), *cert. denied*. 522 U.S. 916 (1997); *Computer Assocs. Int'l. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (quoting 1 Nimmer, § 1.01[B]) (internal quotation omitted)). To determine whether "a particular cause of action involves rights equivalent to those set forth in § 106" and is thus preempted, or whether an "extra element" is present such that preemption does not occur, "the elements of the causes of actions should be compared, not the facts pled to prove them." *Trandes Corp.*, 996 F.2d at 659. Some consideration of the specific allegations in

28

each case is necessary for preemption analysis, however, in order to establish and then to compare the elements of the state law cause of action asserted with the rights created by the Copyright Act. *See Berge*, 104 F.3d at 1463.

The Fourth Circuit has explained that state law claims for conversion, the sister tort to trespass to chattels, will not be preempted "if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying plaintiff's work." *Id.* (citations omitted). But "§ 301(a) will preempt a conversion claim 'where the plaintiff alleges only the unlawful retention of its intellectual property rights and not the unlawful retention of the tangible object embodying its work.'" *Id.* (quoting Paul Goldstein, Copyright, Patent, Trademark and Related State Doctrines 777 (3[d] ed. 1993)). In *Berger* itself, the plaintiff was asserting claims for conversion where the defendants had allegedly plagiarized her research and conclusions in reports to the federal government, and the Fourth Circuit deemed this claim preempted. *Id.; see also Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F.Supp.2d 215, 231 (S.D.N.Y. 2010) (claim alleging that defendant copied ideas preempted); *Miller v. Holtzbrinck Publishers, LLC*, No. 08 Civ. 3508, 2008 WL 4891212, at *3 (S.D.N.Y. Nov. 11, 2008) (claim for conversion where defendant allegedly stole ideas from a manuscript preempted); *Yost v. Early*, 87 Md.App. 364, 388

29

(conversion claim preempted where alleged interference with a property right is reproduction of a copyrighted work), *cert. denied*, 324 Md. 123 (1991).

Analysis involves comparing the elements of the applicable state tort and the alleged facts. Wilson contends that the court must apply Maryland law because of the decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).[8] While Wilson is correct insofar as *Erie* mandates that federal courts apply the substantive laws of the states when exercising diversity or supplemental jurisdiction, *Erie* does not address which state's substantive law should apply. When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983) (holding that district court entertaining supplemental state claims should follow the choice of law rules of the forum state), *cert. denied*, 469 U.S. 1215 (1985). For tort claims, Maryland generally adheres to the *lex loci delicti commissi*, or place of harm, principle to determine the applicable state's

---

[8] Plaintiffs do not clearly state a position as to which state's substantive body of law should apply and refer to cases applying California and New York law in support of their arguments. (*See* ECF No. 52, at 19–21).

substantive law.   *Hauch v. Connor*, 295 Md. 120, 123-24 (1983).

"[W]here the events giving rise to a tort action occur in more

than one State, we apply the law of the State where the injury-

the last event required to constitute the tort-occurred." *Lab.*

*Corp. of Am. v. Hood*, 395 Md. 608, 615 (2006) (citing cases).

The place of the harm for a trespass to chattel claim has

not been specifically discussed by Maryland courts.   In the

context of the tort of conversion, recognized as similar to

trespass to chattels but where the interference with the

property interest is more substantial, Maryland courts have

stated:

> [T]he gist of a conversion is not the
> acquisition of the property by the
> wrongdoer, but the wrongful deprivation of a
> person of property to the possession of
> which he is entitled.   Accordingly, a
> conversion occurs at such time as a person
> is deprived of property which he is entitled
> to possess.

*Staub v. Staub*, 37 Md.App. 141, 143 (1977) (citing *Saunders v.*

*Mullinix*, 195 Md. 235, 240 (1950); *Lawrence v. Graham*, 29

Md.App. 422, 427 (1975)).   Following this logic, the location

where the harm occurs would be the location of the plaintiff

when he is deprived of the property.   Where the harm is not a

deprivation of possession, however, but an impairment to the

tangible object, the harm may occur where the object is located.

In this case, neither application would lead to the conclusion

that Maryland tort law applies.   Instead, New York law, the
place where Plaintiffs were located at the time of the alleged
trespass, or the law of the place where the chattel was located
would apply.[9]

The dispute may be largely academic, however, because the
basic requirements for a claim for trespass to chattels are the
same in Maryland and New York.   In Maryland, "trespass has been
defined as the intentional use or intermeddling with the chattel
in possession of another . . . such intermeddling occurring when
the chattel is impaired as to its condition, quality, or value."
*United States v. Arora*, 860 F.Supp. 1091, 1097 (D.Md. 1994)
(quoting Restatement (Second) of Torts, §§ 217(b), 218(b)).
Under New York law, "[t]o prevail on a claim of trespass to
chattels, plaintiffs must prove the following four elements: (1)
defendants acted with intent, (2) to physically interfere with
(3) plaintiffs' lawful possession, and (4) harm resulted."
*Biosafe-One, Inc. v. Hawks*, 639 F.Supp.2d 358, 368 (S.D.N.Y.
2009); *see also City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882
F.Supp. 1273 (E.D.N.Y. 1995) (citing Restatement (Second) of
Torts, § 256 (1965)) ("One who uses a chattel with the consent
of another is subject to liability in trespass for any harm to

---

[9] There are no facts in the summary judgment record that
identify the location of the website.   The parties agree that
A1-Hosting was hosting the GZM website at the time, but they do
not identify the location of A1-Hosting's servers.

the chattel which is caused by or occurs in the course of any use exceeding the consent, even though such use is not a conversion."). Importantly, both states rely heavily on the Restatement (Second) of Torts.

The chattel identified in Plaintiffs' trespass claim is the GZM website, or alternatively specific webpages within the site. Plaintiffs contend that Wilson deprived GZM of possession of its website and damaged the chattel by inserting a redirect command. Although websites are not tangible property in the traditional sense, courts in Maryland, New York, and elsewhere have been willing to recognize claims for conversion or trespass to chattels involving certain digital things, such as websites and domain names and computer networks. *See Translucent Commc'ns, LLC v. Americas Premier Corp.*, No. WGC-08-3235, 2010 WL 723937, at *15 (D.Md. Feb. 24, 2010) (permitting claim for conversion of domain name); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y. 2003) (holding that the plaintiff could maintain a claim for conversion of his website); *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015, 1022 (S.D.Ohio 1997) (finding that bulk e-mailing by defendants constituted trespass to chattels because "the value of [the] equipment to CompuServe is diminished even though it is not physically damaged by defendants' conduct").

With this background, the actions alleged by Plaintiffs are not violations of legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright.  Plaintiffs do not contend that Wilson reproduced the content of the website, prepared a derivative work, distributed copies of the website, or displayed it in an alternate public forum.  Instead, one component of Plaintiffs' claim is that Wilson deprived them of access to or possession of their own website or specific webpages for a period of time.  This does not overlap with the exclusive rights granted to copyright holders.

Once it is determined that the claim is not preempted, it must next be determined whether Plaintiffs have produced sufficient evidence to defeat summary judgment.  On this claim, Plaintiffs have produced sufficient evidence.  Wilson admits that for a period of time on August 9 or 10, 2009 he took down the GZM website and replaced it with the 2007 version of the site.  He has not claimed that this action was an accident, but rather admits that it was an intentional act.  During this time period, GZM and Suson were arguably dispossessed of the chattel. The Restatement (Second) of Torts § 221 (1965) defines dispossession as follows:  "A dispossession may be committed by intentionally (a) taking a chattel from the possession of another without the other's consent, or . . . (c) barring the

possessor's access to a chattel."   Comment b to § 221 provides that dispossession may occur when someone intentionally assumes physical control over the chattel and deals with the chattel in a way which will be destructive of the possessory interest of the other person.   Comment b further provides that "on the other hand, an intermeddling with the chattel is not a dispossession unless the actor intends to exercise a dominion and control over it inconsistent with a possession in any other person other than himself."   Whether Wilson had the requisite intent to be liable for this tort is a question for the jury.

Wilson's argument that he cannot be liable for trespass to chattels as a co-owner of the copyright is not supported by law. As an initial matter, Wilson's assertion that he is a co-owner of the copyright for the GZM website is not the same as asserting that he is a co-owner of the website itself.   Even if Wilson can prove that he is a co-owner of the website, however, that does not shield him from liability for trespass to chattels or conversion.   It has long been the rule that a co-owner cannot exclude another owner from exercising his equal right to possession or damage, destroy, or sell the jointly owned property on his own because each co-owner has an equal right to possession.   *See* *Felts* *v.* *Collins*, 73 N.Y.S. 796, 798 (N.Y.App.Div. 1901).   To the extent Plaintiffs were unable to

access the website at all, Wilson over-stepped his rights as a co-owner and could be liable for trespass to chattels.

### 4.   Defamation

Counts IV and V of Plaintiffs' second amended complaint allege that Suson and GZM were defamed by Wilson. Specifically, in count IV, Plaintiffs contend that Wilson made defamatory statements about Suson in an email he sent to A1-Hosting on September 12, 2009, stating that Suson was using September 11 for his own profit, in an email sent to an unknown number of third parties on September 13, 2009, stating that Suson was using donations to GZM for gambling purposes, in the website cam-scam.com that Wilson created on November 20, 2009, and in the fake MySpace page for Suson that Plaintiffs alleged was created by Wilson. In count V, Plaintiffs allege that Wilson made defamatory statements about GZM in an August 11, 2009 email sent to A1-Hosting stating that GZM did not possess 501(c)(3) status, in the September 13, 2009 email to A1-Hosting stating that Suson was using September 11 for his own profit, and in the September 13, 2009 email to an unknown number of third parties stating that Suson was using donations to GZM to gamble.

Wilson argues that Plaintiffs have failed to state a claim for defamation, that the identified statements are substantially true, that collateral estoppel precludes several of the claims, and that applicable privileges apply to protect his statements.

In so arguing, Wilson maintains that Maryland defamation law applies, but he does not offer a justification for this choice of law aside from a citation to *Erie*.  As discussed above, this court must apply Maryland's choice of law rules for state law tort claims and Maryland applies the substantive law of the place where the injury occurred.   In defamation actions, the location of the harm is the place where the defamatory statements were published to third parties.  *Wells v. Liddy*, 186 F.3d 505, 522 (4ᵗʰ Cir. 1999)*, cert. denied*, 528 U.S. 1118 (2000); *see also Abadian v. Lee*, 117 F.Supp.2d 481, 485 (D.Md. 2000).

Where communication is published simultaneously in multiple states, application of Maryland's traditional place of harm rule "becomes cumbersome, if not completely impractical." *Liddy*, 186 F.3d at 527.  Because the *lex loci delicti* rule fails to reach a satisfactory result on multistate defamation issues, other district courts in this jurisdiction have ruled that the Court of Appeals of Maryland would adopt the rule stated in the Restatement (Second) of Conflict of Laws.   *Abadian*, 117 F.Supp.2d at 485-86 (citing *Liddy*, 186 F.3d at 528; *Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748, 750 (D.Md. 1997); *Fornshill v. Ruddy*, 891 F.Supp. 1062, 1069 (D.Md. 1995); *Crowley v. Fox Broad. Co.*, 851 F.Supp. 700, 702 (D.Md. 1994)).   The Second Restatement, in pertinent part, provides:

> (1) The rights and liabilities that arise
> from defamatory matter in any ... broadcast
> over radio or television ... or newspaper
> ... or similar aggregate communication are
> determined by the local law of the state
> which ... has the most significant
> relationship to the occurrence and the
> parties [.]
>
> (2) When a natural person claims that he has
> been defamed by an aggregate communication,
> the state of most significant relationship
> will usually be the state where the person
> was domiciled at the time, if the matter
> complained of was published in that state.

Restatement (Second) of Conflict of Laws § 150 (1971 &
Supp.1995). Courts employ the Second Restatement rule in a
"case-by-case balancing test," *Reeves v. American Broadcasting
Cos.*, 719 F.2d 602, 605 (2[d] Cir. 1983), and consider the state of
plaintiff's domicile, the state of plaintiff's principal
activity to which the alleged defamation relates, and the state
where plaintiff suffered the greatest amount of harm, as
significant factors in deciding the applicable law. *Jewell v.
NYP Holdings*, 23 F.Supp.2d 348, 360 (S.D.N.Y. 1998). In most
cases, the plaintiff's state of residence bears the most
significant relationship to the incident and parties because
that is where the plaintiff's reputation suffers the most.
*Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1077
(3[d] Cir. 1985), *cert. denied*, 474 U.S. 864 (1985); *Reeves*, 719
F.2d at 605; *see also AroChem Int'l, Inc. v. Buirkle*, 968 F.2d
266, 270 (2[d] Cir. 1992) (applied Second Restatement rule because

*lex loci* state has "little interest in controlling the remedies available to non-domiciliaries injured by . . . tortious conduct"); *Fitzpatrick v. Milky Way Prods. Inc.*, 537 F.Supp. 165, 171 (E.D.Pa. 1982) ("Defamation laws are undergirded by the state's interest in protecting the individual reputations of its citizens.").

In *Abadian*, the plaintiff was an employee of a health club with branches in Virginia and Maryland.  The alleged defamatory statements about plaintiff were published in a magazine with national circulation.  Applying the Second Restatement analysis, this court determined that although plaintiff was working at a branch of the health club in Maryland at the time she was fired, her injuries overall bore closer ties to Virginia, where she lived and had worked at a club for six years, compared to her mere three months of work at the Maryland location.  117 F.Supp.2d at 486; *see also Wainwright's Vacations, LLC v. Pan Am. Airways Corp.*, 130 F.Supp.2d 712, 721-22 (D.Md. 2001) (applying balancing factors from *Abadian* and determining that Kentucky law applied to single defamation claim alleging that defamatory statements were made in Tennessee and Kentucky and emailed to individuals in Kentucky, Indiana, Ohio, and Tennessee).

In this case, New York law governs the defamation claims. Applying *lex locus delicti* is inconclusive because the websites

Wilson created were accessible on the Internet from any location and the record on summary judgment does not identify the location of A1-Hosting or the unidentified third parties when they received the emails with alleged defamatory statements, so the exact place of publication for these statements is unknown. Applying the Restatement factors, however, points to New York. Suson lives in New York, the museum is located there, and the bulk of Plaintiffs' business activities take place there. In addition, the alleged defamatory statements relate to Plaintiffs' business operations in New York. Accordingly, the brunt of the damage to Plaintiffs' reputation or business interests will be experienced in New York, and New York has the most significant relationship to the alleged defamation.

In New York, the elements of a cause of action for defamation are a "false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." *Salvatore v. Kumar*, 845 N.Y.S.2d 384, 388 (N.Y.App.Div. 2007) (quotations omitted). The four categories which constitute defamation per se are statements (i) charging plaintiff with a serious crime; (ii) tending to injure plaintiff in his or her business or profession; (iii) asserting that plaintiff has a loathsome disease; and (iv) imputing unchastity to a woman. *Liberman v.*

40

*Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992).  "When statements fall within one of these categories, the law presumes that damages will result, and they need not be alleged or proven." *Id.* at 347-48.

Plaintiffs identified the specific defamatory language they allege that Wilson published to third parties in response to Wilson's Interrogatory No. 7.  Applying New York law to the specifically alleged statements, all ultimately fail.

First, Plaintiffs allege that Wilson "falsely email[ed] the GZM that Mr. Suson gambled with GZM funds."  (ECF No. 52-9, at 3).  The only email GZM has provided as evidence is a September 13, 2009 email sent by CartDesigns to groundzeromuseum@aol.com and copied to "Gary Marlon Suson" at susonphoto@aol.com, which states in relevant part "You chose to gamble with the museum's charity funds."  (ECF No. 52-7, at 21). This email cannot satisfy the requirement for a defamation claim that the statement be published to a third party because the Ground Zero Museum is effectively run and controlled by Suson as its executive director and founder.  The very language used by Wilson in the email conveys the fact that he was addressing GZM and Suson as one and the same.  Making a false statement about the entity to whom one is speaking is not defamatory.

Second, Plaintiffs allege that on August 11, 2009, Wilson "falsely emailed A-1 that GZM was making $2000 or more in ticket

41

sales based on Defendant's inspection of Zerve records."
(ECF No. 52-9, at 3-4). The actual text of the email Wilson
sent to A1-Hosting on August 11, 2009 states: "Yet in an email
to me yesterday, and over the phone, the proprietor, Mr. Gary
Suson, has indicated that the museum ticket sales meet or exceed
two thousand dollars ($2000.00) a day." (ECF No. 46-1, Ex. 11,
GZM 127). Indeed the previous day, Suson had sent an email to
Wilson that stated:

> If you do anything to sabotage the Ground
> Zero Museum Workshop by way of "pulling" (as
> you stated) our domain off of A-1 hosting
> without giving us a reasonable time to find
> a new host, you will be responsible for
> reimbursing our 9/11 Nonprofit Museum the
> $2,000.00 per day it generates off of web
> sales.

(ECF No. 46-1, Exhibit 9, GZM 276). Accordingly, there is no
evidence that Wilson made the specific statement alleged by
Plaintiffs regarding ticket sales information gathered from
Zerve and the statement that was made in Wilson's email to A1-
Hosting was true insofar as Suson had emailed Wilson the prior
day asserting web sales of $2,000 a day. No reasonable jury
could conclude that this statement was defamatory.

Third, Plaintiffs contend that in an August 11, 2009 email
from Wilson to A1-Hosting, Wilson questioned GZM's 501(c)(3)
status. The actual text of the email does not expressly mention
501(c)(3) status and instead includes the statement: "I make no

42

claim as to knowing whether the allegations against Mr. Suson are true, however a New York newspaper alleges that Mr. Suson has donated only a 'few hundred dollars' to charities" and includes a link to the New York Post article.  It further states "I make no additional claim as to what the legal definition of a non-profit charity is (and I am not interested in Mr. Suson's explanations), but in my opinion, this is not what I would call a non-profit charity."  (ECF No. 52-7, GZM 127-28).  This email does not include the statement that Plaintiffs allege it did, and at most contains a clearly labeled statement of Wilson's opinion.  "Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation."  *Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008) (citing *Weiner v. Doubleday & Co.*, 549 N.E.2d 453  (N.Y. 1989), *cert. denied*, 495 U.S. 930 (1990)).  Determining whether a particular statement constitutes an opinion or objective fact is a question of law that often raises difficult issues, but where the statement is clearly introduced as the speaker's opinion, as is the case here, a defamation claim must fail.  *See id.*

Fourth, Plaintiffs contend that Defendant falsely claimed that Suson had created a MySpace page and "falsely ridiculed Mr. Suson by using a photograph Defendant knew to be out of date." In his affidavit, Wilson avers that he did not create the

43

MySpace page (ECF No. 46-1, Exhibit 1 ¶ 45), and Plaintiffs have produced no evidence to contradict Wilson.   The bare allegation that Wilson created the page, without any evidence in support, is insufficient to prove that Wilson is responsible for the MySpace page.   Furthermore, Wilson's use of a photograph of Suson on the cam-scam.com website that Suson admits is a photograph of him does not become defamatory simply because Suson dislikes the photograph or thinks it portrays him in an unflattering manner.

Fifth, Plaintiffs claim that on a date better known to defendant between October and December 2009, "Defendant created the Take the Gary Suson Quiz page . . . which ridiculed Mr. Suson and sought to sow doubts into the minds of readers regarding the legitimacy of Mr. Suson's titles and accomplishments at Ground Zero."   Yet again, Plaintiffs neither identify the specific statements that they claim are defamatory, nor do they provide any proof that such a quiz page ever existed.   A vague assertion that a website existed at some former time with statements that ridiculed Suson is insufficient to defeat a motion for summary judgment.

Sixth, Plaintiffs claim that Wilson falsely stated that Suson profited from September 11 in an email he sent to A1-Hosting on September 12, 2009.   The actual text of the email states:   "I can't tell you how much it irks me that this

slimeball used 9-11 for profit." (ECF No. 52-7, at 19). Although Plaintiffs may take offense at Wilson's choice of words they have not established that the facts expressed are false, a burden that rests with the plaintiff in cases asserting libel or defamation. *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1275 (N.Y. 1991) (citing Philadelphia Newspapers v. Hepps, 475 U.S. 767, 776 (1986); *Steinhilber v. Alphonse*, 501 N.E.2d 550 (N.Y. 1986); *Silsdorf v. Levine*, 449 N.E.2d 716 (N.Y.), *cert. denied* 464 U.S. 831 (1983), *cert. denied*, 500 U.S. 954 (1991)). While Wilson's statement has a negative connotation, it is true that GZM is a museum that would not exist if the events of September 11, 2001 had not occurred. It is also true that Plaintiffs charge admission for visits to the museum and sell merchandise. Indeed in this very case, Plaintiffs are seeking GZM's lost profits as damages. Plaintiffs cannot convincingly argue that this statement is false, and therefore it cannot be defamatory.

Finally, although not listed in their interrogatory responses, Plaintiffs allege in their complaint that Wilson's cam-scam.com website is defamatory. Plaintiffs have not identified specific claims or statements on the website that they contend are defamatory and from the excerpts provided in the summary judgment record, there do not appear to be any defamatory statements. To the extent that Plaintiffs intended to assert that the content of the New York Post articles linked

or copied on the cam-scam.com website are defamatory, this court is bound by the determination to the contrary in New York state court. In *Suson v. NYP Holdings, Inc.*, et al, No. 300605 TSN 2006, in the Civil Court for the City of New York, Gary Suson sued the New York Post alleging, among other things, that a series of articles published in the New York Post concerning Suson and his museum were defamatory. In that case, Judge Hagler awarded summary judgment in favor of the defendants on all counts, in the process determining that Suson was a limited purpose public figure (ECF No. 46-7, at 17), that Suson had not demonstrated actual malice, and that some of the statements were not true (specifically the statement that Suson had not honored his pledge to donate certain proceeds from his Museum). (*Id.* at 18-19). The determination that the New York Post articles were not defamatory is binding on this court through the doctrine of issue preclusion. Under New York law "[w]here a pending issue was raised, necessarily decided and material in a prior action, and where the party to be estopped had a full and fair opportunity to litigate the issue in the earlier action, fairness and efficiency dictate that the party should not be permitted to try the issue again." *Bansbach v. Zinn*, 801 N.E.2d 395, 401 (N.Y. 2003) (citing *Pinnacle Consultants, Ltd. v.*

*Leucadia Natl. Corp.*, 727 N.E.2d 543 (N.Y. 2000)).[10]   "The party invoking issue preclusion must demonstrate the identity of the issues in the prior and current litigations and must establish that the issues were previously decided on the merits.   The party seeking to defeat the application of the defense has the burden of establishing the absence of a full and fair opportunity to litigate the issues in the prior action." *Thomas & Agnes Carvel Found. v. Carvel*, 736 F.Supp.2d 730, 758 (S.D.N.Y. 2010).   Issue preclusion applies here because Suson had a full and fair opportunity to litigate the issue of whether the New York Post articles were defamatory in the New York state court case and lost on the merits.

For all these reasons, summary judgment will be granted for Defendant on the defamation counts.

### 5.   Tortious Interference In a Business Relationship

In count VI of their complaint, Plaintiffs allege that Wilson tortiously interfered with Plaintiffs' business relationship with A1-Hosting.   Plaintiffs contend that Wilson induced A1-Hosting to cease donating hosting services to GZM "by ordering them to no longer provide such services in his email of August 10, 2009" and "by falsely claiming that GZM was not a

---

[10] "[T]he preclusive effect of a judgment rendered in state court is determined by the law of the state in which the judgment was rendered." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 162 (4th Cir. 2008).

501(c)(3) organization that would entitle it to donated services." (ECF No. 39 ¶¶ 181-83).

Although Wilson refers to Maryland law, here again because the injury from the alleged tortious interference occurred in New York, where Suson and GZM maintain their business, New York tort law applies. It makes little difference, however, as both Maryland and New York impose essentially the same requirements to recover for tortious interference with business relationship. The elements of tortious interference with business relationships under Maryland law are:

> (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628-29 (2003). Under New York law, the elements of a claim for tortious interference with business relations are as follows: "(1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, and (4) injury to the business relationship." *Excellus Health Plan, Inc. v. Tran*, 287 F.Supp.2d 167, 177 (W.D.N.Y. 2003) (citing *Nadel v. Play-By-Play*

48

*Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2$^d$ Cir. 2000)).   In
both states the courts have limited the scope of acts that may
give rise to claims for tortious interference.   In Maryland:

> [t]ortious or deliberate intent to harm a
> plaintiff's business relationship is not
> alone sufficient to support an intentional
> interference claim. There also must be proof
> that the defendant's conduct in interfering
> with contract or business relations was
> accomplished through improper means.
> Alexander v. Evander, 336 Md. 635, 656, 650
> A.2d 260 (1994); Macklin v. Logan Assocs.,
> 334 Md. 287, 301, 639 A.2d 112 (1994).
> Consequently, to recover for tortious
> interference with business or contractual
> relationships, the defendant's conduct must
> be "independently wrongful or unlawful,
> quite apart from its effect on the
> plaintiff's business relationships.

*Lyon v. Campbell*, 120 Md.App. 412, 431 (1998) (citations
omitted).   Expanding on the issue of "improper means," the Court
of Appeals of Maryland recognized the types of unlawful means
that may give rise to liability as "violence or intimidation,
defamation, injurious falsehood or other fraud, violation of the
criminal law, and the institution or threat of groundless civil
suits or criminal prosecutions in bad faith."   *K & K Mgmt., Inc.
v. Lee*, 316 Md. 137, 166, (1989) (internal citations omitted).
New York courts have likewise limited the scope of wrongful
means that may give rise to liability to include "physical
violence, fraud or misrepresentation, civil suits and criminal
prosecutions, and some degrees of economic pressure."   *Guard-*

*Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980).

Under either state's law, Plaintiffs' claim fails because they cannot establish that Wilson committed a wrongful act.  As discussed above, Wilson's email to A1-Hosting raising his doubts about GZM's charity mission does not constitute defamation. Plaintiffs allege in their second amended complaint that Wilson ordered GZM to cease providing hosting services in his email of August 10, 2009, but the email from Wilson to A1-Hosting contains no such order nor any other language that could reasonably be considered wrongful.  Wilson does state that he told Suson "we cannot allow him access at an A1-Hosting server without me being the webmaster."  While this may have been an overstatement in terms of his authority to speak for A1-Hosting, it does not constitute tortious interference.

### 6.   Violation of 17 U.S.C. § 512(f)

In their final count[11] Plaintiffs allege that Wilson violated a section of the DMCA when he falsely claimed that his trademarks constituted copyrighted material and requested that

---

[11] Plaintiffs label this "Count Six" but it is actually the seventh count of the complaint.

A1-Hosting take down portions of the GZM website containing that material.[12]

17 U.S.C. § 512(f) provides:

> Any person who knowingly materially misrepresents under this section--
>
> (1) that material or activity is infringing, or
>
> (2) that material or activity was removed or disabled by mistake or misidentification,
>
> shall be liable for any damages, including costs and attorneys'[] fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

There is not a great deal of case law interpreting this provision of DMCA, but district court cases that have addressed the provision offered additional gloss on the meaning of the terms "knowing" and "material misrepresentation" as used in § 512(f). "Knowingly" has been interpreted to mean "that a party actually knew, should have known if it acted with

_____

[12] Plaintiffs' complaint references 15 U.S.C. § 512(f) and 26 U.S.C. § 512(f). Neither citation is correct as 15 U.S.C. § 512(f) does not exist and 26 U.S.C. § 512 is a portion of the Internal Revenue Code. The applicable statute is 17 U.S.C. § 512(f).

reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations." *Online Policy Grp. v. Diebold, Inc.*, 337 F.Supp.2d 1195, 1204 (N.D.Cal. 2004).   And "[a] material misrepresentation is one that 'affected [the infringer or service provider's] response to a DMCA letter.'" *Capitol Records, Inc. v. MP3tunes, LLC*, 611 F.Supp.2d 342, 346 (S.D.N.Y. 2009) (quoting *Online Policy Grp.*, 337 F.Supp.2d at 1204).

Applying the statute here, Plaintiffs' claim fails.   Even assuming that Wilson acted knowingly, a fact not established by the record, his conduct did not violate the statute because it did not provoke a response from A1-Hosting and did not result in any harm to Plaintiffs.   Upon receipt of Wilson's notice, A1-Hosting informed him that it was no longer hosting the GZM website on its servers; instead it believed GZM's new host was LunarPages.com.   (ECF No. 46-1, Ex. 29, GZM 258).   Accordingly, A1-Hosting could not and did not take any action in response to the DMCA notice, and there were no consequences to Plaintiffs as a result.   Thus, Plaintiffs cannot prove that the service provider relied on the misrepresentation or that it incurred any damages as a result of the notice.   Judgment will be granted in favor of Wilson on this count.

IV.  **Motion for Leave to File Amended Counterclaim**

Defendant Wilson moves for leave to amend his counterclaims to add two counts: (1) seeking a declaratory judgment that "Defendant became a co-owner of the GZM website based on the collaborative contributions of Suson and Defendant between on or about July 2007 through August 18, 2009" and (2) requesting that "the court direct that GZM account for all proceeds derived from the GZM website from the period of on or about July 2007 to date, and order GZM to pay Defendant fifty percent (50%) of all such proceeds to Defendant as co-owner of the copyright in the GZM website."  (ECF No. 47-3 ¶¶ 64-67).  Wilson maintains that the amendment is necessary to conform his pleading to facts learned in discovery and that Plaintiffs will not suffer undue prejudice.  (ECF No. 47-1).

Plaintiffs oppose the motion and argue that not only should Wilson's motion for leave to amend be denied, but also that Wilson's other counterclaims were waived or abandoned when not reasserted in his answer to the first and second amended complaints.  (ECF No. 50 ¶¶ 4-5, 29-33).  Plaintiffs also argue that granting Defendant leave to amend would be prejudicial and that his motion should be denied because he failed to confer with Plaintiffs' counsel to seek their consent to the motion prior to filing, in violation of Local Rule 103.6.d.

A brief discussion of the procedural history regarding Plaintiffs' and Defendant's pleadings is necessary. Plaintiffs' initial complaint was filed in December 2009. Defendant's answer and counterclaims were filed on February 16, 2010. (ECF No. 8). Plaintiffs moved to dismiss the counterclaims, and that motion was denied on September 22, 2010. (ECF Nos. 10, 22, and 23). The parties proceeded with discovery throughout the remainder of the Fall. On December 3, 2010, the parties filed a joint status report indicating that all written discovery had been served and all expert reports exchanged. (ECF No. 31). Ten days earlier, on November 23, 2010, Wilson had filed his answer to Plaintiffs' amended complaint in which he did not reassert his counterclaims. (ECF No. 30). Plaintiffs' second amended complaint was filed on February 17, 2011 (ECF No. 39), and Defendants' answer was filed on December 22, 2011 (ECF No. 40). Although Wilson did not reassert his counterclaims in this answer either, two days later on February 24, 2011, Wilson filed for leave to amend the counterclaims. (ECF No. 47). Wilson's counterclaims, thus, were indisputably at issue for the majority of the discovery period, and Wilson repeatedly took actions to indicate his intent to pursue the counterclaims. Plaintiffs failed to conduct discovery regarding the claims at their own peril and their claim of prejudice if the claims are not deemed waived is not compelling.

Plaintiffs also cite no case law in support of their theory that failure to reassert counterclaims when responding to an amended complaint results in waiver or abandonment of the counterclaims.   In fact the few courts to consider the issue have not reached a consensus.   Several courts have held that failure to reassert counterclaims in response to an amended complaint does not waive the counterclaims or otherwise affect their viability.   *See Dunkin' Donuts, Inc. v. Romanias*, No. Civ.A.00-1886, 2002 WL 32955492, at *1-2   (W.D.Pa. May 29, 2002) (failure to include counterclaims in amended answer does not waive them); *cf. Hitachi Med. Sys. Am., Inc. v. Horizon Med. Grp.*, No. 5:07CV02035, 2008 WL 5723531, at *5 (N.D.Ohio Aug. 29, 2008) (denying plaintiff's motion to strike counterclaim because it was untimely repleaded in response to an amended complaint).   Other courts have reached the opposite conclusion and deemed the counterclaims waived.   *See Settlement Capital Corp. v. Pagan*, 649   F.Supp.2d   545,   562   (N.D.Tex.   2009)   (finding   that counterclaims not reasserted in defendant's amended answer were abandoned); *Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.*, 2009 WL 702009, at *12 (D.Minn. Mar. 13, 2009) (determining that defendant's failure to replead the counterclaims, coupled with nearly two years passing without discovery or any action on the counterclaims and their lack of merit as a matter of law, warranted their dismissal); *cf. Doe v. Williston Northampton*

*Sch.*, --F.Supp.2d --, 2011 WL 693217, at *3 (D.Mass. Feb. 28, 2011) (granting motion to dismiss counterclaims for failure to prosecute pursuant to Rule 41(b) where the counterclaims were not reasserted in response to amended complaints).

The reasoning of the United States District Court for the Western District of Pennsylvania in *Dunkin' Donuts* is persuasive on this issue:

> Rule 13, which governs counterclaims, requires only that a counterclaim be set forth in a pleading-it does not mandate that it be contained in an answer. See Fed.R.Civ.P. 13(a)-(f). Further, an answer responds to the allegations in a complaint, a counterclaim is something independent. Revisions to a complaint do not require revisions to a counterclaim.

2002 WL 32955492, at *2. Additionally, despite his failure to reassert the counterclaims when answering Plaintiffs' first and second amended complaints, Wilson has otherwise manifested his intent to pursue the counterclaims throughout the case history by defending against Plaintiffs' motion to dismiss them and by moving to amend them. Wilson has not failed to prosecute them or otherwise waived his right to pursue them.

Having determined that Wilson's original counterclaims are still at issue in the case, the next question is whether Wilson should be granted leave to add two additional counterclaims. Motions for leave to amend counterclaims are subject to the same standards as all motions for leave to amend pleadings. Motions

for leave to amend pleadings after the deadline for amendment set in a scheduling order has passed trigger both Federal Rule of Civil Procedure 15(a), governing amendments to pleadings, and Rule 16(b), governing scheduling orders.   The standards for satisfying these two rules are at odds.   Rule 15(a)(2) states, in pertinent part, that "leave shall be freely given when justice so requires," while Rule 16(b)(4) states that "[a] schedule may be modified only for good cause and with the judge's consent."   The Fourth Circuit resolved this tension in *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008):

> Given their heavy case loads, district courts require the effective case management tools provided by Rule 16.   Therefore, after the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings.   This result is consistent with rulings of other circuits.   *See O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154-55 (1st Cir. 2004); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2[d] Cir. 2000); *S & W Enters. v. SouthTrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003); *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003); *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437-38 (8th Cir. 1999); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998).

Fed.R.Civ.P. Rule 16(b)'s "good cause" standard focuses on the timeliness of the amendment and the reasons for its tardy submission.   Because a court's scheduling order "'is not a

frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril,'" *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D.Md. 1999) (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D.Me. 1985)), a movant must demonstrate that the reasons for the tardiness of its motion justify a departure from the rules set by the court in its Scheduling Order.

The primary consideration for Rule 16(b)'s "good cause" standard is the movant's diligence.  Lack of diligence and carelessness are the "hallmarks of failure to meet the good cause standard." *W. Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.*, 200 F.R.D. 564, 567 (S.D.W.Va. 2001).  "[T]he focus of the inquiry is upon the moving party's reasons for seeking modification.  If that party was not diligent, the inquiry should end." *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995).

Here, Wilson argues that he seeks to amend his counterclaims to conform them to evidence first learned in the course of discovery.  (ECF No. 47-1).  In particular Wilson references a production of 902 pages of documents by Plaintiffs on January 31, 2011.  (*Id.*).  Although Defendant does not identify specific pages within this production that support his new counterclaims, the implication is that there is a temporal connection between the two.  Although Plaintiffs oppose the

motion for leave to amend, they do not contest this factual allegation. From this record, Wilson's motion is not untimely and he has acted with appropriate diligence in seeking leave to amend, thereby satisfying Rule 16(b)'s requirements.

Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Denial of leave to amend should occur "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). A motion to amend, however, should be made as soon as the necessity for altering the pleading becomes apparent. *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987).

Plaintiffs do not argue that Wilson's proposed counterclaims are futile; they primarily identify procedural deficiencies with the motion and process by which Wilson sought leave. Plaintiffs are correct that Wilson failed to comply with Local Rule 103, but their subsequent argument that they were given no choice to consent or deny such consent to Wilson's amended counterclaims makes little sense. Plaintiffs exercised their opportunity to deny consent by filing their opposition to the motion for leave. Plaintiffs also argue that the motion was

untimely, but they do not directly address or rebut Wilson's contention that the delay was in part due to Plaintiffs' own delay in responding to discovery requests and they have offered no evidence that the delay was in bad faith aside from vague generalizations.   Any potential prejudice to Plaintiffs from allowing the new claims can be ameliorated by providing Plaintiffs an opportunity to conduct additional discovery limited to the new claims and to move for summary judgment on those claims should they desire.

The motion for leave to amend will be granted.

## V.   Conclusion

For the foregoing reasons, the motions to strike filed by Plaintiffs will be denied, the motion for summary judgment or dismissal filed by Defendant will be granted in part and denied in part, and the motion for leave to amend the counterclaims filed by Defendant will be granted.   A separate order will follow.

                              /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge